**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIANE RECZEK, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO: 07-00013 (GMS) |
| | : | |
| JHA WILMINGTON, INC., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM
IN SUPPORT OF CLAIM FOR DAMAGES**

NOW COMES plaintiff, Diane Reczek ("Ms. Reczek"), by and through her undersigned

counsel, and submits this Memorandum in support of her claim for damages in the above-

captioned action.  The Court will recall that this memorandum was requested at the time of the

damages hearing, April 11, 2008, to allow plaintiff to secure documents from plaintiff's file at

the Delaware Department of Labor ("DDOL").  Relevant documents from Ms. Reczek's DDOL

file are attached hereto as Exhibit A (documents dated December 2004 to November 2005),

Exhibit B (January 2006 to May 2006), and Exhibit C (June 2006 to February 2007), all of which

are incorporated herein by reference.

I.      BACKGROUND

Ms. Reczek was employed by defendant, JHA Wilmington, Inc., d/b/a Tilton Terrace

("JHA"), starting in late December 2004, as a Licensed Practical Nurse and Unit Manager.  Her

starting rate of pay was $28.75/hour, which did not change during the course of her employment.

Throughout Ms. Reczek's employment with JHA she was subjected to severe and pervasive

harassment and discrimination based upon her race (white).  Ms. Reczek described the treatment

she endured from her supervisors and managers, as well as the impact this conduct had on her emotional and physical well-being, during her testimony on April 11. Counsel will not repeat this testimony here. The treatment was sufficiently damaging to Ms. Reczek that she sought medical treatment in September 2005 (a colonoscopy following bouts of diarrhea), and began treating with Xanax. Ms. Reczek continues to treat with Xanax to this day. Copies of Ms. Reczek's colonoscopy reports and a receipt for the Xanax (½ month - 15 tabs) are attached hereto as Exhibit D and are incorporated herein by reference.

On September 16, 2005, Ms. Reczek filed an Intake Questionnaire with the DDOL, complaining of the racial discrimination she believed to exist at JHA. On September 19 Ms. Reczek informed JHA of her intent to resign, effective September 28. She was subsequently denied unemployment, and filed her formal Charge of Discrimination on November 8, 2005. Copies of the relevant documents from Ms. Reczek's DDOL file that show these events are attached as part of Exhibit A.

JHA, through its original counsel, responded to and denied the Charge of Discrimination in a very detailed and comprehensive Position Statement that was filed with the DDOL on or about January 13, 2006. Several months later the DDOL responded with a request for additional information, which was supplied by JHA on May 30, 2006. Copies of JHA's submissions, and the DDOL's request for information, are attached as Exhibit B.[1]

---

[1] The submissions by JHA are attached without the exhibits referenced therein. These exhibits are quite voluminous and contained information not relevant to the purposes of this damages memorandum.

In addition to the additional document request, the DDOL conducted interviews of at least two witnesses (which were reduced to writing in the investigative file). On July 10, 2006 the DDOL issued a detailed letter that summarizes the positions of the parties, and describes in detail the conduct Ms. Reczek experienced while employed with JHA. The DDOL concluded that Ms. Reczek was subjected to dissimilar treatment because of her race. JHA was allowed additional time to provide a response to this letter, but instead its original counsel notified the DDOL of its withdrawal (July 21, 2006). No further submissions were made by JHA. The DDOL subsequently issued a "Final Determination and Right to Sue Notice," which found reasonable cause to believe that discrimination occurred. Mandatory conciliation was scheduled and completed on August 17, 2006.[2]

On January 9, 2007, Ms. Reczek filed her Complaint. JHA initially defended the action, through its second counsel, but counsel filed a motion to withdraw in May, 2007. An Entry of Default pursuant to F.R.C.P. 55(a) was entered in July 2007, and this memorandum follows the damages hearing that was held on April 11, 2008. Upon information and belief, JHA has ceased operations and has no assets.

During her employment with JHA Ms. Reczek earned $28.75 an hour, or $59,800.00 per year. Having been denied unemployment, Ms. Reczek was unable to secure new employment for seven months, until April 2006. Her new position initially paid $25.00/hour, or $52,000.00 per year. While Ms. Reczek did receive annual increases, she has yet to attain the same level of compensation she received while employed with JHA. Copies of Ms. Reczek's last JHA pay

---

[2]A separate Right to Sue Notice was issued by the Equal Employment Opportunity Commission on October 30, 2006, and this action was filed within ninety (90) days of that Notice.

stub, her 2005 W-2 form, and her 2007 W-2 form (all redacted) are attached as Exhibit E and are incorporated herein by reference.  Additionally, as was shown through her very emotional testimony during the damages hearing, Ms. Reczek continues to suffer considerable pain, anguish, and distress when she recounts her experience with JHA, and continues to treat with Xanax.

II.    SUMMARY OF DAMAGES

Ms. Reczek's demand for damages includes the following categories: back and front pay; medical costs and charges; emotional distress; punitive damages; attorney's fees and costs.  A breakdown of each item follows:

Back/Front Pay

Using Ms. Reczek's JHA income ($28.75/hour or $59,800.00/year) as a baseline, her back and front pay damages are as follows:

| | | |
|---|---|---|
| 1. | Seven (7) months of no income and no unemployment | $ 34,883.33 |
| 2. | One (1) year at $25.00/hour ($52,000.00/year), salary differential | $ 7,800.00 |
| 3. | One (1) year at $26.33/hour ($54,766.40/year), salary differential | $ 5,033.60 |
| 4. | One (1) year of front pay at $27.65/hour ($57,512.00/year) | $ 2,288.00 |

**Total Back/Front Pay Damages          $50,004.93**

4

Medical Costs

A copy of the receipt for Ms. Reczek's Xanax prescription is attached as part of Exhibit

D.  Ms. Reczek pays $11.50 for 15 tabs of Xanax, or roughly a ½ month supply, and has done so

since at least December 2005 (32 months).

**Total Medical Damages               $    736.00**

Emotional Damages

Ms. Reczek continues to suffer severe and pervasive emotional trauma as a result of her

experience with JHA.  This was evident during the damages hearing on April 11, 2008.  Ms.

Reczek therefore seeks damages for her **emotional distress in the amount of at least**

**$150,000.00.**

Punitive Damages

At no time did JHA raise any affirmative or statutory defenses with respect to damages.

In light of the conduct of JHA, by and through its employees, Ms. Reczek is entitled to **punitive**

**damages in an amount of at least $150,000.00.**

Attorney's Fees and Costs

Attached hereto as Exhibit F, and incorporated herein by reference, is the affidavit of

Delaware counsel with respect to the attorney's fees and costs incurred in this action, and a

statement from primary counsel with respect to his firm's fees and costs.  Ms. Reczek was

represented primarily by Kevin Lovitz, Esquire, of the Lovitz Law Firm in Philadelphia,

Pennsylvania.  Delaware counsel for this matter is G. Kevin Fasic, Esquire, of the Law Offices of

G. Kevin Fasic, LLC.  Attorney's Fees and Costs are as follows:

| | | | |
|---|---|---|---|
| 1. | For Mr. Lovitz (Fees) | $ | 3,575.00 |
| 2. | For Mr. Lovitz (Costs) | $ | 425.90 |
| 3. | For Mr. Fasic (Fees) | $ | 9,381.50 |
| 4. | For Mr. Fasic (Costs) | $ | 37.85 |

**Total Attorney's Fees and Costs        $ 13,420.25**


III.   <u>CONCLUSION</u>

Plaintiff Diane Reczek suffered immeasurably as a result of her treatment by defendant JHA Wilmington, Inc., and continues to experience the trauma, pain, humiliation and embarrassment caused by the conduct of its employees.  JHA is in default, and is presumed to be out of business.  Nevertheless, Ms. Reczek is entitled to an award of her back and front pay, medical expenses, damages for emotional distress, punitive damages, and to recover her reasonable attorney's fees and costs.

LAW OFFICES OF G. KEVIN FASIC


By: /s/ G. Kevin Fasic
      G. Kevin Fasic, Esquire (DE 3496)
      1225 King Street, Suite 200
      Legal Arts Building
      Wilmington, DE 19801
      (302) 654-4501 - Telephone
      (302) 654-4406 - Facsimile
      k.fasic@lawgkf.com - E-Mail

Dated: June 11, 2008

# EXHIBIT "A"

# TILTON TERRACE

Date: _12/28/04_

Dear _DIANE RECZEK_

This letter is to confirm our offer of employment for:

Position: _LPN - UNIT MANAGER_

Work Status: _FULL TIME_ Hours: _7-3_

Pay Rate: _#28.75/HR; Shift differential if applicable_

Pay Schedule: Every two weeks.

Orientation Date/Time/ Place: _12/28/04 - 8:00 AM_

Please note that this offer is contingent upon the successful completion of our screening process which includes drug screening, criminal background checks, child and adult abuse registry checks, service letters, and verification of certification, license, or degree (if applicable). This offer is not intended to create any contractual rights for you or the company.

Nursing staff (RN's LPN's and C.N.A.'s) must come to orientation in uniform. Nurses should be prepared to spend at least 8 hours at orientation (CNA's 4 hours). <u>Current</u> C.N.A certificates and nursing licenses must be provided at orientation or you will <u>not be permitted to begin employment.</u> Also, please bring the following current health documents if you have had these shots:
PPD info (results of TB testing)
Hepatitis B Injection dates (if you have had one).
Copy of chest x-ray if you have had a positive PPD

<u>All</u> persons must bring to orientation acceptable documentation to complete the I-9 form (list provided to you at background check meeting) or <u>you will not be able to begin employment.</u>

Sincerely,

Laraine L. Jordan
H. R. Recruiter

LLJ/

INTAKE QUESTIONNAIRE

OFFICE OF LABOR LAW ENFORCEMENT

Please answer the following questions. Please print. Completion of this form does not constitute the filing of a Charge.

*(1)* FULL NAME: Diane Elizabeth Reczek

STREET ADDRESS: 30 Mary Dr.

CITY: Aston     STATE: PA     ZIP: 19014

TELEPHONE (HOME): (610) 364 0131     (WORK) (302) 652-3861     AGE: 44

BIRTHDATE: 4/24/61     SOC. SEC. NO. 179547906

SEX: F     RACE: White     NATIONAL ORIGIN: Irish/Russian

*(2)* Fully describe the details of your complaint. I am one of 5 white employees.
In my work, I am a minority. I am held to conditions
of employment which no one else is held to. They have
attempted to do to write me up for taking 15 min breaks & state
I am only allowed ten. My supervisor constantly harasses
me, made a racial remarks, called & referred to me as
the "white girl/nurse" & writes me up for offenses which
other employees are not.

*(3)* Does your complaint involve any of the following? ☒ Employer ☐ Labor Organization ☐ Employment Agency
Provide the full name, address and telephone number of the organization involved.

Company Tilton Terrace     Telephone # 302-652-3861

Delaware Street Address 801 N. broom St

City, State, Zip Wilmington De 19806

Number of Employees 80+     Date(s) of employment Jan-present     Date(s) of action 09/13/05 SUSPENDED

*(4)* What, if anything, has changed with your employment situation as a result of the action?
The constant harassment has caused a decline
in my ability to perform my job because I am
always afraid of being singled out.

*(5)* Why do *you* believe this action was taken against you? I believe because of my race.
There are two other woman (one is white, the other
is half white, half black) that also are being
harassed by the supervisor who is black.

*(6)* What documentation, if any, do you have? They refuse to give me any write up copies
employee handbook I am also sending a certified
letter to the administrator, on 9/19/05 to document the
harassement.

Signature Diane Reczek     Date 9/16/05

DOL Form A-02 : 8/04

Dear Mike Salitsky,                          *September 19th, 2005*

    *This letter is to officially inform you my decision to resign from my position at Tilton Terrace on September 28th, 2005 as my last day of employment.*

    *This decision is based upon the harassment and higher standard to the code of conduct/employment which are imposed on me unjustly.*


      *Sincerely,*

      *Diane Reczek*

Exhibit 5

**Division of Unemployment Insurance**

| | | | |
|---|---|---|---|
| Claimant | DIANE E RECZEK | SS Number: 1  54-7906 | Delivered by Mail |
| Address | 30 MARY DR | Local Office: 0 | Redet: No |
| | | Fund Code: 10 | Count: Yes |
| | ASTON, PA 19014-0000 | Claim Date: 10/02/2005 | |
| | | Date of AC:  / / | |
| | | Case Number: 024308 | |

**Findings of Fact:**

The claimant was employed with Tilton Terrace from 12/28/04 to 9/28/05. They claimant says she resigned because the employer was harassing her and held her to different standard than other employees. She says they wrote her up consistently and she feared for her nursing license. The claimant reports she attempted to work through HR to contest the negative implications of the job but after they made her make an appointment to review her personnel file, there was no one in the office at the time she was to be here. The claimant's final write up was on 9/13 for failing to write a doctor's orders and she was suspended for 3 days. She says a similar incident occurred the night before with another nurse of a different race and there was no penalty so she felt there was discrimination. The employer reports the claimant resigned on 9/19/05 with an ending date of 9/28/05. They state she did contact HR to review her personnel file and had an appointment for 9/22/05. The employer says the claimant did not keep the appointment and when they looked for her in the building, she had gone. The employer disputes any discrimination or harassment and stipulates all write-ups given were justified. The HR rep also indicates she attempted to try to set up a session with the

*note*

**Continued on Page 2**

**Title 19 of Delaware Code 3314(1)**

An individual shall be disqualified for benefits: (1) For the week in which he left work voluntarily without good cause attributable to such work and for each week thereafter until he has been employed in each of 4 subsequent weeks (whether or not consecutive) and has earned wages in covered employment equal to not less than 4 times the weekly benefit amount.

**Determination:**
You are disqualified for receipt of benefits, effective with or for week ending 10/08/2005.    $330.00 x 4 = $1320.00

**Claims Deputy Signature:**                                    **Date: 10/27/2005**

If you disagree with this determination, you should ask the Claims Deputy for an explanation. If you are not satisfied with the explanation, you may file an appeal.

**Claimant and Employer Appeal Rights**

This determination becomes final on    11/06/2005    unless a written appeal is filed. Your appeal must be received or postmarked on or before the date indicated. If the last date to file an appeal falls on a Saturday, Sunday or Legal Holiday, the appeal will be acceptable the next business day.

If you file an appeal and are still unemployed, you must continue to file weekly claim pay authorization forms with the local office, as instructed, until you receive a final decision.

| | |
|---|---|
| **Employer Name and Address** | TILTION TERRACE<br>801 N BROOM ST<br><br>WILMINGTON, DE 19806-0000 | **No charge will be made against your assessment employer account in this case.** |

Labor
Unemployment Insurance

DELAWARE
DEPARTMENT OF
LABOR

Notice of
Determination
UC-409

Page 2

Claimant  DIANE E RECZEK
Address   30 MARY DR

          ASTON, PA  19014-0000

SS Number: 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
Local Office: 0
Fund Code: 10
Claim Date: 10/02/2005
Date of AC:  / /
Case Number: 024308

Delivered by Mail
Redet: No
Count: Yes

**Findings:**

claimant and her supervision to work out the differences but the claimant refused.  The employer states they did not report any incidents to the state licensing authority.  In the case of a voluntary quit, the claimant must present evidence of good cause for leaving a job as well as evidence that they pursued all administrative remedies prior to quitting.  The claimant began the administrative process with HR but did not pursue that option.  Her resignation is dated prior to the HR appointment.  The claimant has not met the burden of proof.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

ENTER CHARGE NUMBER

- [ ] FEPA  0511054IW
- [ ] EEOC  17CA600098

**Delaware Department of Labor**   and **EEOC** (if applicable)

| NAME (Indicate Mr., Mrs., Ms) Ms. Diane E. Reczek | HOME TELEPHONE NO. (Include Area Code) 610-364-0131 | |
|---|---|---|

STREET ADDRESS 30 Mary Dr.   Aston PA 19014      CITY, STATE AND ZIP CODE  DE     COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME Tilton Terrace | NO. OF EMPLOYEES OR MEMBERS +20 | TELEPHONE NUMBER (Incl. Area Code) 302-652-3861 |
|---|---|---|

STREET ADDRESS 801 N. Broom St. Wilmington,   CITY, STATE AND ZIP CODE  DE 19806

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

STREET ADDRESS     CITY, STATE AND ZIP CODE

| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE<br><br>☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify) | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST 2/28/2005<br>LATEST 9/28/2005<br>☐ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: The Charging Party worked for the Respondent as a Nursing Unit Manager (LPN) in their residential nursing facility. She was discharged on 9/28/2005

Charging Party's protected class: Race (white)

Adverse employment action: Harassment/Terms & Conditions/Suspension/Constructive Discharge

Brief statement of allegations: The Charging Party alleges she was continually harassed and held to higher standards in the workplace as compared to her similarly situated coworkers. She specifically alleges her supervisors and subordinates constanty referred to her as the "white girl." Further, management had written her up for taking time to deal with her daughters medical condition when leave time had previously been approved. The Charging Party also alleged that she was disciplined as a result of taking the same time alloted for breaks that every other employee was afforded.

Respondent's explanation: The Respondent stated they were merely following policy, even though they selectivly enforced the policy to the Charging Party's detriment.

Applicable law(s): Title VII of the Civil Rights Act of 1964 and the Delaware Discrimination in Employment Act. Both as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: The Charging Party contends she has been singled out and subjected to harsh treatment by her management and coworkers beause she is one of a handfull of white nurses in the unit. The Charging Party states these other individuals are treated in the same manner as the Charging Party. The Charging Party has complained to management regarding this disparate treatment, but the Respondent has taken no action to remedy the situation. Finally, because of the constant derogatory racial comments and the harassment, the Charging Party felt that she was left with no reasonable alternative than to resign her position with the Respondent.

Additional information and verification of these facts are provided by the attached Verification.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT<br>X *Diane E Reczek*<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|

DDOL FORM B- 05
REV 01-05    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# VERIFICATION
Pursuant to Title 19 Del. C. § 712(c)(1)

State of Delaware                           )
                                            )          ss:
_New Castle_ County                         )


I, _MS. Diane E. Reczek_, swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information) _Nothing follows._



_Diane Reczek_
Charging Party's Verification Signature

**SWORN TO AND SUBSCRIBED** before me this _8th_ day of _November_, 2005.

_BJ Sands_
Notary Public/Attorney at Law


BRENDA J. SANDS
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires 2/3/07

# EXHIBIT "B"



Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Wendy K. Voss
Partner
Attorney at Law
wvoss@potteranderson.com
302 984-6076  Direct Phone
302 658-1192  Fax

January 13, 2006

Ms. Julie Cutler, Administrator
Discrimination Program
State of Delaware Department of Labor
Division of Industrial Affairs
4425 N. Market St.
Wilmington, DE 19802

Re:     **Diane E. Reczek v. Tilton Terrace (Case No. 05110541W/
17CA600098)**

Dear Ms. Cutler:

As you know, this firm has been engaged to represent respondent JHA Wilmington, Inc., d/b/a Tilton Terrace ("Tilton Terrace") in regard to the above referenced Verified Charge of Discrimination (the "Charge"). Tilton Terrace denies Diane Reczek's allegation that it discriminated against her and harassed her on the basis of her race, and forced her resignation. As set forth more fully below, Ms. Reczek's discipline was consistent with Tilton Terrace's policies and its treatment of *all* of its employees, and her resignation was completely voluntary. Tilton Terrace further denies that Ms. Reczek was constructively discharged.

This letter and the exhibits hereto, copies of which are being provided to Ms. Reczek today by first class mail, will serve as Tilton Terrace's answer to the Charge. Attached to this letter are the following supporting submissions: the statement of Myra King (Tab A); the statement of Angela Paylor (Tab B); the statement of Laraine L. Jordan (Tab C); copies of relevant portions of the Tilton Terrace employee handbook and relevant nursing policies, and Ms. Reczek's acknowledgment of having received a copy of the handbook (Tab D); copies of Employee Discipline/Corrective Action forms issued to Ms. Reczek (Tab E); and other documents pertaining to Ms. Reczek's Charge (Tab F).

### ANSWER TO THE CHARGE

Tilton Terrace denies the allegations of race discrimination and harassment made by Ms. Reczek. Ms. Reczek's race did not play any role in the decisions to discipline her or in her supervisors' actions in general. Ms. Reczek was disciplined for violations of Tilton Terrace policies, with which she should have been intimately familiar, as she was in a supervisory position and responsible for disciplining her own subordinates for similar violations.

Ms. Julie Cutler
January 13, 2006
Page 2

Furthermore, to the extent that Tilton Terrace may have had higher expectations for her than for other employees, it was because she held a supervisory position and was expected to set a positive example for all other employees. Regardless, Ms. Reczek was disciplined and otherwise treated in accordance with Tilton Terrace's established policies, which are applicable to all employees.

In her Charge, Ms. Reczek claims that she was continually harassed and held to higher standards in the workplace as compared to similarly situated coworkers. Specifically, Ms. Reczek alleges that she was constantly referred to as the "white girl," that she was disciplined for taking time to deal with her daughter's medical condition for which leave time had been previously approved, and that she was disciplined for taking break times that had been allotted for all other employees. As a result of this alleged continual harassment, Ms. Reczek claims that she was left with no reasonable alternative other than to resign her position with Tilton Terrace.

Ms. Reczek's allegations are untrue.

I.    Facts

        A.    General Background

Ms. Reczek was hired by Tilton Terrace on December 28, 2004, as a full-time "LPN—Unit Manager"[1] for the 7:00 a.m. to 3:00 p.m. shift.[2] Tab C. Ms. Reczek resigned her employment on September 19, 2005, effective September 28, 2005. Id. Throughout her employment, her immediate supervisor was Myra King, the Assistant Director of Nursing. Id. Ms. King's immediate supervisor was Angela Paylor, Director of Nursing. Id. At the time she was hired, Ms. Reczek went through orientation and, as a part of that orientation, Tilton Terrace supplied Ms. Reczek with a copy of the Employee Handbook setting forth its discipline and other policies. Tabs C and D. In addition, Ms. Jordan, Tilton Terrace's Human Resources Manager, had her assistant, Carol Rychalsky, explain the Tilton Terrace policies contained in the Employee Handbook in detail to Ms. Reczek, to insure that she had adequate familiarity with these policies. Tab C. Finally, Ms. Reczek was instructed to review the Employee Handbook in detail. Id.

As an LPN—Unit Manager, Mr. Reczek was responsible for supervising her subordinates, i.e., she was responsible for enforcing Tilton Terrace policies and setting an example by adhering strictly to those policies. Tab C. In addition to her supervisory duties, Mr. Reczek was responsible for the normal duties of a LPN. Id. Thus, not only did Ms. Reczek need to know Tilton Terrace policies thoroughly so that she could enforce them and set an example,

---

[1] An "LPN" is a "Licensed Practical Nurse." Tab C.

[2] Ms. Reczek was hired with the understanding that she might have to work as a charge nurse in he event of unforeseen circumstances such as weather-related emergencies or other staffing shortages. Tab C.

Ms. Julie Cutler
January 13, 2006
Page 3

she needed to be competent as an LPN. Id. When her actions did not conform to Tilton Terrace policy and/or the performance of her nursing duties was not within acceptable standards, Ms. Reczek – like all other employees – was subject to disciplinary action.

**B.    Ms. Reczek's Disciplinary History**

In less than a year, Ms. Reczek was subject to discipline on four separate occasions. Ms. Reczek's disciplinary history shows that she could not or would not conform to the very same Tilton Terrace policies that as a supervisor, she was expected to enforce. For each violation of Tilton Terrace policy, Ms. Reczek was disciplined appropriately, in accordance with Tilton Terrace's policy of progressive discipline.[3]

**1.    Ms. Reczek Violated the Policy Concerning Excessive Unscheduled Absences.**

Within less than two months of her hire date, Ms. Reczek had begun to have attendance problems. As a result, Ms. King issued a Corrective Action Form on April 4, 2005. Tab A. On or about that date, Ms. Reczek received a verbal warning for excessive unscheduled absences and unprofessional behavior. Id. The unscheduled absences for which Ms. Reczek was disciplined occurred on February 7 and 23, 2005, and March 16 and 30, 2005, and were noted on the Corrective Action Form. Tab D. In addition, the following early departures were listed on the Corrective Action Form: March 15, 22, and 29, 2005. Id. As discussed in more detail below, none of these absences were approved in advance; thus, they were an appropriate subject for discipline under Tilton Terrace's policies. In fact, had Tilton Terrace so desired, it's policies would have permitted additional discipline based on Ms. Reczek's early departures, which were in addition to her four unexcused absences. Tab A.

Attendance of employees at Tilton Terrance is taken very seriously, as appropriate staffing is vital to the functioning of the facility and the safety of its residents. Tab C. In fact, if Tilton Terrace has a staff member who has an unscheduled absence, lateness, or early departure, Tilton Terrace can fall below State of Delaware-mandated staffing levels, thus jeopardizing its license as a nursing home. Id. Therefore, Tilton Terrace has a strict, no fault policy with respect to employee absences. Id. As a supervisor, Ms. Reczek was (or should have been) keenly aware

---

[3] Tilton Terrace adheres to a policy of progressive discipline. Tab C. The progressive steps of discipline are (1) verbal warning, (2) written warning, (3) suspension, or (4) termination of employment. Id. Usually, Tilton Terrace will use the discipline in a progressive fashion; however, depending upon the severity of the employee's conduct and whether how often the conduct has taken place, Tilton Terrace may depart from the normal progression, and skip steps all the way to termination of employment. Id. Attendance and/or lateness problems have a specific disciplinary process that must be followed, which differs somewhat from the overall progressive discipline policy. Id.

Ms. Julie Cutler
January 13, 2006
Page 4

of that policy, and should have been setting an example to her subordinates of good attendance. Id.

Tilton Terrace policy provides for two types of absences, scheduled and unscheduled. Tab C. A scheduled absence is an absence for which approval has been requested in writing using a "Paid Time Off Request Form," and is approved **in writing prior to** the absence. Id. An unscheduled absence is an absence that was not approved **in writing prior to** the absence. Id. Unscheduled absences for consecutive days due to illness are counted as only one unscheduled absence. Id. Therefore, even if an absence occurs for a legitimate reason, or if a Paid Time Off request form is approved after the absence, that absence is still considered an unscheduled absence which can be the basis of disciplinary action under the no-fault policy. Id. An employee is disciplined for unscheduled absences only when such absences become "excessive." Id.

Tilton Terrace allows for the occasional unscheduled absence due to legitimate reasons such as emergency or illness by allowing an employee four unscheduled absences before discipline is imposed, and by counting successive days of an unscheduled absence as only one unscheduled absence. Tab C. According to Tilton Terrace policy, unscheduled absences such as Ms. Reczek's absences will be considered excessive when an employee has reached four such absences within a twelve month period. Id. After the first four unscheduled absences in any twelve month period, a verbal warning will be issued. Id. After the fifth unscheduled absence, the employee will receive a written warning. Id. After the sixth unscheduled absence, the employee will be suspended for three days without pay. Id. Finally, if the employee has a seventh unscheduled absence within a twelve month period, the employee will be terminated from employment. Id.

The April 4, 2005, Corrective Action Form also noted that Ms. Reczek was failing to maintain a professional demeanor; specifically, she was discussing intimate personal affairs with subordinates. Tab A. Such behavior is entirely inappropriate for a person in a supervisory position and, in the opinion of her supervisors, it undermined her supervisory authority. Id. At the time the discipline was issued, Ms. Reczek was advised that she could discuss her personal problems with her supervisors, or through the employee assistance program, but should refrain from discussing such highly personal issues with her subordinates. Id. Her management further advised her that although Tilton Terrace was empathetic to her personal problems, Tilton Terrace still expected that she comply with its policies. Id.

## 2.    Ms. Reczek Violated the Medical Assessment Record Policy.

Ms. Reczek again received discipline approximately two months later, on June 17, 2005, when she was given a verbal warning for extremely poor performance by neglecting a basic nursing procedure. In April 2005, Ms. Reczek had received an order from a doctor requiring a patient to receive medication. Tab A. At Tilton Terrace, when a nurse receives such an order from a doctor, that order must be placed on the Medical Assessment Record ("MAR"). Id. Otherwise, the patient will not receive his or her medication. Id. In this case, Ms. Reczek failed to record the doctor's order, and the patient went without a prescribed medication for a

Ms. Julie Cutler
January 13, 2006
Page 5

period of time as a result. Id. The mistake was not discovered until the State of Delaware audited Tilton Terrace in June 2005, and brought the error to Tilton Terrace's attention. Id.

Ms. Reczek violated a very basic procedure which any LPN employed by Tilton Terrace should have known, and this violation affected patient care. Tab A. Unsatisfactory job performance by virtue of failing to adhere to Tilton Terrace's Nursing Guidelines on Medication Administration is a proper basis for discipline pursuant to Tilton Terrace's policy concerning employee conduct. Id. As a result of Ms. Reczek's unsatisfactory job performance, Ms. King issued a Corrective Action Notice on June 17, 2005. Id.

Although Ms. Reczek already had received a verbal warning for her violation of Tilton Terrace's attendance policy, she was given a verbal warning for this poor performance because attendance violations are tracked separately from other violations.[4]

### 3.     Ms. Reczek Violated the Cell Phone Policy.

Approximately two more months later, on August 8, 2005, Ms. King had to issue to Ms. Reczek a written warning—the next step in progressive discipline from the previous verbal warning—for an incident that occurred on August 4, 2005. Tab A. In the midst of a wound care review meeting that Ms. King also attended, Ms. Reczek's cell phone rang. Id. Instead of ameliorating the disruption to the meeting to the best of her ability at that point, Ms. Reczek answered the call and conversed on the cell phone during the meeting. Id. Not only did Ms. Reczek violate a Tilton Terrace policy by having a cell phone in the facility in the first place, but she also rudely disrupted a meeting as well. Id.

Specifically, Ms. Reczek's conduct was a violation of Tilton Terrace policy #506, which provides that cell phones are not permitted in the Tilton Terrace facility. Tab A. The practical application of the policy, however, is that it is not applied to administrators, who have their own offices and can use cell phones at their discretion. Id. Instead, the policy is in place to avoid employees using their cell phones inappropriately, such as when they are in contact with patients or in any other manner that interferes with their duties. Id. Employees may do as they like with regard to making personal cell phone calls outside of the facility during their break or lunch times. Id. Thus, as a practical matter, the policy is not enforced until an employee is observed using a cell phone inappropriately inside the facility. Id.

### 4.     Ms. Reczek Violated Tilton Terrace's Employee Conduct Policy.

Only one month later, on September 12, 2005, Ms. Reczek committed an extremely serious violation of Tilton Terrace policy in her care of an elderly patient, who had been scheduled for surgery later that day. Tab B. Because the patient was scheduled for surgery,

---

[4] In fact, Tilton Terrace could have proceeded to the next step in progressive discipline, a written warning, since Ms. Reczek's discipline on April 4, 2005, was also based on her improper conduct in discussing personal matters with staff.

Ms. Julie Cutler
January 13, 2006
Page 6

there was an order in place that the patient could not take anything by mouth, as it might cause complications during surgery. Id. This type of order is very common for surgical patients, and any nurse should have been familiar with this type of order. Id. Disregarding that order, Ms. Reczek then called a doctor at the surgery center at St. Francis who did not have the proper credentials to give orders for Tilton Terrace patients, and from whom Ms. Reczek therefore had no authority to take orders. Id. Ms. Reczek claimed that the patient had abnormal blood sugar levels and requested an order from the doctor, purportedly to bring the patient's blood sugar levels back within normal ranges. Id. (However, when Ms. Reczek's supervisors later checked the patient's records, they found the patient did not have blood sugar levels that were abnormal to the point that required treatment. Id.) Prior to contacting the doctor, Ms. Reczek neglected to contact a supervisor as called for in the Tilton Terrace Diabetic Protocol. Id. Hearing Ms. Reczek's (incorrect) explanation regarding the patient's blood levels, the doctor told Ms. Reczek to give the patient fluids. Id. Ms. Reczek then disregarded Tilton Terrace's Diabetic Protocol, and gave the patient an incorrect dosage of milk. Id.

In addition to improperly requesting an order from a doctor not credentialed to give orders for Tilton Terrace patients, Ms. Reczek did not obtain proper written documentation of the verbal order as required by Tilton Terrace procedure. Tab B. Instead, Ms. Reczek documented the verbal order in a deceptive fashion, attempting to make the order appear as though it had been given by a staff doctor rather than a doctor without the proper credentials. Id. The staff doctor recognized that the order was not his, and refused to sign it. Id.

This chain of events was an especially egregious violation of Tilton Terrace Policy, which in all instances requires staff to follow medical orders as written and according to any applicable Tilton Terrace protocols, and resulted in the patient's surgery being cancelled. Id. By her actions, Ms. Reczek violated Tilton Terrace policies prohibiting unsatisfactory safety performance, unsatisfactory job performance, and negligence in job performance. Id.

As a result of this incident, on September 13, 2005, the Director of Nursing (Ms. Paylor) suspended Ms. Reczek for three days without pay, on Wednesday, September 14, Thursday, September 15, and Friday, September 16, 2005. Tab B. Therefore, the next day that Ms. Reczek was expected to report to work was Monday, September 19, 2005. Id. While Ms. Paylor supervisor followed progressive discipline in this instance, this violation was so severe that in Ms. Paylor's view it warranted a suspension, or even more severe action, whether or not the employee had prior discipline. Tab C.

### B.    Ms. Reczek Resigned Without Having Complained of Harassment or Discrimination of Any Kind.

On September 19, 2005, Ms. Reczek's first day back at work after her suspension, she went to see Laraine Jordan, Tilton Terrace's Human Resources Manager. Tab C. During the meeting, she showed Ms. Jordan a letter of resignation, which she already had submitted to Mike Salitsky, Administrator of the facility. Id. The letter announced that her last day of work would be September 28, 2005. Id. During that meeting, Ms. Reczek expressed, for the first time, her concerns that she had been subject to poor treatment because of her race. Id.

Ms. Julie Cutler
January 13, 2006
Page 7

Although Tilton Terrace has appropriate policies in place to prevent discrimination and harassment and provides a complaint procedure for any employee who believes she or he has been subjected to harassment prior to her resignation, Ms. Reczek had never attempted to use those policies. Tab C. Tilton Terrace's Equal Employment Opportunity policy provides that employees may confidentially report any form of discrimination to human resources. Id. The policy further provides that if any employee has been violating the policy, that person will be subject to disciplinary action, up to and including termination of employment. Id. A separate policy for reporting harassment of any kind (the "Sexual & Other Unlawful Harassment" policy), is also in place. Id. Finally, Tilton Terrace has a policy that addresses the need for problem resolution in general. Id. This policy allows employees to take their grievances up the chain of command, and to continue up to the highest level of management if their complaints are not addressed. Id.

Prior to submitting her resignation, Ms. Reczek had never before complained of her alleged poor treatment at Tilton Terrace to Ms. Jordan or to anyone else. Tab C. Upon hearing Ms. Reczek's complaints for the first time, Ms. Jordan gave Ms. Reczek the opportunity to rescind her resignation, offering to help her to resolve the problems. Id. Ms. Reczek refused this offer. Id.

Even though Ms. Reczek refused the offer to rescind her resignation and to have the assistance of Human Resources in resolving her problems, Ms. Jordan nonetheless investigated Ms. Reczek's claims. Tab C. Ms. Reczek spoke with Ms. King and Ms. Paylor, and reviewed Ms. Reczek's personnel file. Id. Ms. Jordan found no irregularities; Ms. Reczek had been disciplined according to Tilton Terrace policies, and her supervisors denied that she had been referred to as the "white girl." Id. Furthermore, neither Ms. King nor Ms. Paylor had ever asked or attempted to force Ms. Reczek to resign. Tabs A and B.

### C.   Ms. Reczek's Specific Factual Allegations are Either False or Taken Out of Proper Context

#### 1.   Ms. Reczek Was Not Referred to as the "White Girl" by Her Supervisors.

Ms. King and Ms. Paylor categorically deny calling Ms. Reczek the "white girl" and have no knowledge of any other Tilton Terrace employees calling Ms. Reczek the "white girl." See Tabs A and B. Ms. Reczek never made any complaints of which her supervisors or Ms. Jordan were aware prior to her resignation that she had been called "white girl." See Tabs A, B, and C. Moreover, if Ms. Reczek had been called "white girl" by her subordinates in such a manner that it could be construed as derogatory, she had the authority and the duty to discipline that behavior. Id. She never did so and never reported such conduct to her supervisors.

Ms. Julie Cutler
January 13, 2006
Page 8

## 2.    Ms. Reczek Was Disciplined for Legitimate Business Reasons.

Ms. Reczek complains that she was disciplined for taking breaks, and for taking time to deal with her daughter's medical condition when leave time had been previously approved. These allegations are not true.

As the August 8, 2005 Corrective Action Form shows, Ms. Reczek was not, in fact, disciplined for taking breaks. Tab A. While Ms. Reczek technically was violating Tilton Terrace policy by taking longer than the allotted 10 minute breaks, when Ms. King wrote up the Corrective Action Form for Ms. Reczek's violation of the cell phone policy and included a statement concerning excessive break time, Ms. Reczek pointed out a discrepancy between the way that employees were being scheduled and the Tilton Terrace policy concerning breaks. Id. Due to an error, employees were being scheduled to take 15 minute breaks although the Tilton Terrace break policy allowed for only 10 minutes. Id. As a result of this discrepancy, Ms. King rescinded that portion of the Corrective Action Form that mentioned excessive break time. Id. Therefore, Ms. Reczek was not disciplined for taking breaks, as she now claims.

Ms. Reczek's complaint that she was disciplined unfairly for taking time off to deal with her daughter's medical condition for which leave time had been previously approved is similarly inaccurate. For the most part, the dates for which Ms. Reczek was disciplined for her excessive unscheduled absences were not dates, to Ms. King's recollection, that coincided with occasions on which Ms. Reczek had to take time to care for her daughter. Tab A. The only dates listed on the Corrective Action Form concerning Ms. Reczek's attendance problems that her supervisor recalls had to do with her daughter's medical condition were the unscheduled absence of February 23 and 24, 2005.[5] Id.

Regardless, although these absences might have occurred for a legitimate reason, and even though Ms. King might have told Ms. Reczek after being informed of the absence that it was permissible to miss work on February 23 and 24, 2005, under Tilton Terrace's no-fault attendance policy that did not exempt them from being counted as an unscheduled absence. Tab A. The determinative fact is that this absence was not approved **in writing prior to** her taking the leave. Id. Similarly, the fact that Ms. Reczek submitted a Paid Time Off request form on February 28, 2005, and received approval of the form from Ms. King on that same day does not signify that the absence was not to be counted as an unscheduled absence. Id. The purpose of the form was not to retroactively approve Ms. Reczek's absence so that it would not be counted on her record; the purpose of the form was to insure that Ms. Reczek would be paid for those days off. Tab C.

According to Tilton Terrace policies, it is of no import whether an unscheduled absence is for a legitimate reason; an unscheduled absence is one that is not approved **in writing prior to** the absence. Tab C. Tilton Terrace gives each employee four such unscheduled

---

[5] Ms. Reczek was absent on February 23 and 24, 2005, which, according to Tilton Terrace policy, is counted as only one unscheduled absence.

Ms. Julie Cutler
January 13, 2006
Page 9

absences each year before the unscheduled absences are considered to be excessive in order to account for legitimate illnesses and emergencies. Id. Thus, Ms. Reczek simply exceeded the allowed amount of unscheduled absences that any employee is allowed, and like any employee was issued a Corrective Action Form as a result.[6]

### 3.    Ms. Reczek Was Treated the Same as Other Employees.

Ms. Reczek also complains that she was held to a higher standard than other employees and disciplined more harshly. Ms. Reczek offers no facts to support her bare allegation that other, similarly situated employees were treated more favorably than she. As explained above, Ms. Reczek was disciplined for violating Tilton Terrace policies, and her discipline was issued in a manner consistent with Tilton Terrace disciplinary procedures.

As a Unit Manager, Ms. Reczek was told numerous times that she was expected to perform to a higher lever than other employees because she was a supervisory employee, responsible for upholding Tilton Terrace policies. Tab A. Ms. Reczek similarly was told that if she failed to perform competently or adhere to Tilton Terrace policies, it reflected badly on all of the employees in her unit and would undermine her ability to gain the respect and obedience of her subordinates. Id. While Tilton Terrace would have had a legitimate business reason for holding Ms. Reczek to a higher standard than other employees and perhaps even disciplining her more harshly than others, the reality was that Tilton Terrace treated her no differently from any other employee, as the manner in which she was disciplined demonstrates. She was disciplined for violations of Tilton Terrace policies, and her discipline tracked the progressive discipline policy without variation.

## II.    Ms. Reczek Cannot Establish As A Matter of Law That She Was Subject to Racial Discrimination or Harassment, or Constructive Discharge.

In order to make out a *prima facie* case of discrimination, a Charging Party has the burden of showing that similarly situated persons who were not members of the protected class were treated more favorably, or show other evidence of discriminatory motive. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981); Simpson v. Kay Jewelers, 42 F.3d 639, 645 (3d Cir. 1998). As described above, the facts do not support Ms. Reczek's claim that she was disciplined in any manner other than according to Tilton Terrace policy, and she does not provide any names of comparators or other specific information that other similarly situated employees engaged in the same conduct and were not disciplined. Instead, Ms. Reczek provides only inaccurate facts, and a bare allegation that she was disciplined more harshly than similarly

---

[6] In fact, Ms. Reczek was allowed more leeway than called for under the Tilton Terrace attendance policy, as her four unscheduled absences were combined with her early departures and unprofessional behavior, both of which could have been the subject of separate Corrective Action Forms. Tab C.

Ms. Julie Cutler
January 13, 2006
Page 10

situated coworkers because of her race. Ms. Reczek's allegations in support of her claim of racial discrimination thus fail to state a claim.

Even if Ms. Reczek can establish a *prima facie* case of discrimination, she cannot show that Tilton Terrace's proffered reason (*i.e.* that she was in violation of Tilton Terrace policies) for her discipline is pretextual. In essence, Ms. Reczek merely disagrees with her supervisors' application of Tilton Terrace's policies and the standards to which she was held. This argument holds no weight. As a matter of law, an employer is entitled to make decisions concerning an employee's status, even if they turn out to be erroneous. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992), cert. denied, 510 U.S. 826 (1993); Billet v. Cigna Corp., 940 F.2d 812, 828 (3d Cir. 1991); see also Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999) ("Where an employer has honestly described the motivation for its decision, that decision is not pretext for discrimination just because the plaintiff asserts the defendant's beliefs were inaccurate."). See also Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (to show discrimination "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Ms. Reczek's allegations of racial harassment and constructive discharge similarly fail. To establish a claim for harassment, Ms. Reczek must show that the harassing behavior was so severe or pervasive as to alter the terms and conditions of her employment. Pennsylvania State Police v. Suders, 542 U.S. 129, 133-34 (2004) (sexual harassment/constructive discharge case).[7] In addition, in order to show constructive discharge as a result of such alleged harassment, Ms. Reczek must show that the abusive work environment was so intolerable that a reasonable person in her position would have resigned. Id. See also Goss v. Exxon Office Systems Co., 747 F.2d 885, 887 (3d Cir. 1984) (To make out a claim for constructive discharge, a plaintiff must show that, acts of discrimination in violation of Title VII [have made] working conditions so intolerable that a reasonable employee would be forced to resign.").

The only overtly harassing behavior that Ms. Reczek mentions in her Charge is being called "white girl." Even if her allegation is true, it is not clear that Ms. Reczek herself considered the alleged harassment to be severe or pervasive, given that she took no action whatsoever by making a complaint concerning her supervisors or in disciplining her

---

[7] The analysis of racial harassment claims is similar to claims involving sexual harassment. The U.S. Supreme Court noted that its cases developing the law of sexual harassment have relied upon cases concerning racial harassment and that the standards of the two claims should be harmonized to the extent possible. Faragher v. City of Boca Raton, 524 U.S. 775, 786-87 and fn. 1 (1998). See also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, fn. 2 (1998); Mack v. Otis Elevator Co., 326 F.3d 116 (2d Cir. 2003) (example of a case in which the sexual harassment analysis concerning employer liability and affirmative defense availability is applied to a claim of racial harassment).

Ms. Julie Cutler
January 13, 2006
Page 11

subordinates. Furthermore, her allegation that she was referred to as the "white girl," even if true, might demonstrate insensitivity or a lack of professionalism on the part of others but is not sufficient to rise to the level of severe or pervasive harassing behavior.[8] Woodard v. PHB Die Casting, 2005 U.S. Dist. LEXIS 28673, *11 (W.D. Pa. 2005) (stating that courts have consistently required a stronger showing of egregious conduct than insensitive or unprofessional conduct and that even racial epithets will not necessarily alter the terms and conditions of an employee's conduct such that actionable racial harassment has occurred) (collecting the following cases: Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68, 75-77 (3rd Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American employees] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially neutral alleged mistreatment of the employee); Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 870 (8th Cir. 2004) (denying summary judgment where plaintiff was subjected to six racially derogatory comments, including use of the "n-word" in his presence, and particularly because plaintiff witnessed a physically threatening graffiti depicting his name in conjunction with a burning cross and a KKK sign, but noting that the decision to deny summary judgment "is not altogether free from doubt," and that the facts straddled the "cusp of submissibility."); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir. 2002) (holding that "racist graffiti - drawings of 'KKK,' a swastika, and a hooded figure" on the walls of the plant bathroom, a racially derogatory "poem" strewn about the plant, and three racially derogatory comments made about plaintiff (but out of his presence) were "neither severe nor pervasive. . ."); Peters v. Renaissance Hotel Operating Co., 307 F.3d 535 (7th Cir. 2002) (finding that six incidents, including a reference to black music as "wicka wicka woo music" by a supervisor, a bartender's request to investigate an African-American guest who was allegedly stealing coins from a fountain, other African-American guests being denied additional ice and cups for a party, and one use of the "n-word" in plaintiff's presence, were not severe or pervasive); Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (holding that two overtly racial remarks directed at plaintiff, including use of the terms "n-word" and "KKK," distribution of an arguably racial cartoon, and general ridicule and harassment were not severe or pervasive).)

Moreover, Ms. Reczek's claim for harassment must fail because Tilton Terrace has in place policies that are meant to prevent and address any type of harassment or discrimination, and Ms. Reczek unreasonably failed to avail herself of those policies. See Suders, 542 U.S. at 134 (In a case in which no tangible employment action is present, an employer may defend against a harassment and constructive discharge claim by showing, "(1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of

---

[8] In addition, it is not clear that the term "white girl" is even a racially derogatory term, as this term could be used in a purely descriptive manner.

Ms. Julie Cutler
January 13, 2006
Page 12

that employer-provided preventative or remedial apparatus.").[9]  See also Faragher, 524 U.S. at
807, and Mack, 326 F.3d 127 (citing Burlington, 524 U.S. at 765).  As recounted above, Tilton
Terrace has appropriate policies in place to prevent and address any type of harassment or
discrimination.  Not only did Ms. Reczek unreasonably fail to proactively seek out the proper
channels for her complaints prior to resigning, but when she finally did complain, Ms. Jordan
was receptive and offered to assist her and allow her to rescind her resignation.  Reczek
unreasonably refused this offer.  Even when Ms. Reczek refused this offer of help, Ms. Jordan
took the complaint seriously enough to investigate Ms. Reczek's claims of poor treatment.  Thus,
Ms. Reczek cannot now claim that, even if her allegations concerning the alleged harassment are
true and were egregious enough to rise to the level of actionable harassment—which Tilton
Terrace disputes—that Tilton Terrace should be held responsible when it had no opportunity to
know of the alleged harassment or to address it prior to her resignation.

Finally, Ms. Reczek has not alleged that her supervisors ever asked her to resign
or otherwise engaged in acts amounting to constructive discharge.  Additionally, it is remarkable
that if the alleged harassment was so intolerable, Ms. Reczek never complained, disciplined her
subordinates, or resorted to Tilton Terrace's policies for reporting such harassment.  It appears
that, rather than being about an employee that was forced to resign due to harassment, this case is
about a poor performer who knew that if she violated Tilton Terrace policy one more time, she
might be terminated from employment pursuant to the progressive discipline policy.  Rather than
face this possibility, Ms. Reczek decided to quit.  This scenario does not constitute an abusive
work environment that was so intolerable that a reasonable person in her position would have
resigned.  See Suders, supra.

_____

[9] To the extent that Ms. Reczek claims that this affirmative defense is not available to Tilton
Terrace because her allegedly discriminatory discipline constituted a tangible employment
action, this argument fails as well.  As discussed above, she has presented absolutely no evidence
that would demonstrate a discriminatory motive for her discipline.

Ms. Julie Cutler
January 13, 2006
Page 13

<u>CONCLUSION</u>

For the foregoing reasons, Tilton Terrace respectfully submits that the Charge is without merit. Ms. Reczek cannot show that she was subject to racial discrimination or harassment, or that she was constructively discharged. Instead, Ms. Reczek is an employee who did not perform to the standards expected of her as a supervisory level employee, and failed to adhere to even the most basis policies promulgated by her employer, and her resignation was voluntary. Therefore, the Charge should be dismissed.

If you require further information in regard to this matter, or if I can be of further assistance, please do not hesitate to contact me.

Sincerely yours,

Wendy K. Voss

cc: Laraine Jordan
    Diane Reczek



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*

May 2, 2006

Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Attn.: Wendy K. Voss, Esquire

## VIA FASCIMILE AND REGULAR MAIL

RE:    Reczek v Tilton Terrace
       Case No:  05110541W/17C-2006-00098
       Request for Additional Information

Dear Ms. Voss:

As you are aware, the above-reference Charge of Discrimination has been assigned to me for investigation.  I have reviewed the material submitted to date, and find that I need the following data:

1.  Provide a complete copy of Policy #506 Computer, Internet, Telephone and Mail from the Tilton Terrace Employee Handbook;

2.  Provide an organizational chart of all of Respondent's medical staff with each individuals name, title/position, race and date(s) of employment; be sure to include and highlight all of the individuals who make up Charging Party's upper management and Charging Party's subordinates, provide this chart for the time period of the calendar year of 2005;

3.  Provide the names of all of the employees who have failed to record a doctor's order on the medical assessment record, include each of these above mentioned individual's title/position, their race and the type of disciplinary action issued to him/her; also provide the supportive documentation for each above mentioned individual, provide this information for the calendar years of 2002, 2003, 2004 and 2005;

4.  Provide a copy of the State of Delaware Auditor's report for the calendar years of 2004 and 2005, specifically the portion of that report that relates to the audit findings on the Medical Assessment Records;

Ms. Wendy K. Voss
May 2, 2006
Page Two


5. Provide a list of all individuals who have been employed by Respondent during the calendar years of 2003, 2004 and 2005, who have been issued disciplinary actions for a violation of Respondent's Nursing Guidelines on medication administration; include each individuals name, title/position, dates of employment, race, a copy of their disciplinary action and the name of the individual who issued the disciplinary action;

6. Provide a list of all the (medical staff) employees that have been terminated during the past 4 years (2002, 2003, 2004 and 2005); for each discharged employee list their name, title/position, date of employment, race, a copy of the disciplinary action(s) that lead to their termination and the name(s) of the individuals who issued the disciplinary action(s).


The above material must be provided by no later than May 15, 2006. As the investigator, I would like to let you know that this office encourages settlement discussions at all stages of the administrative process. Toward that end, I am available to assist you now or at any time during the investigation with settlement attempts.

Please contact me at (302) 761-8205 if you have any questions. Thank you for your attention and anticipated cooperation.


Sincerely,

Melinda Shelton
Labor Law Enforcement Officer
Office of Labor Law Enforcement



**Potter Anderson & Corroon** LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**Wendy K. Voss**
**Partner**
Attorney at Law
wvoss@potteranderson.com
302 984-6076 Direct Phone
302 658-1192 Fax

May 30, 2006



**HAND DELIVERY**
Ms. Melinda Shelton
Labor Law Enforcement Officer
Office of Labor Law Enforcement
Department of Labor, Division of Industrial Affairs
4425 North Market Street
Wilmington, Delaware 19802

Re: **Diane E. Reczek v. Tilton Terrace; Case No.: 05110541W/17C-2006-00098**

Dear Ms. Shelton:

As requested in your letter of May 2, 2006, Respondent Tilton Terrace provides the following supplemental information and documentation in response to Ms. Reczek's charge of discrimination. For your convenience, these responses are numbered in accordance with the requests set forth in your letter.

1.    Attached at Tab A is Tilton Terrace policy #506 regarding Computer, Internet, Telephone and Mail.

2.    Attached at Tab B is a general organizational chart, showing the reporting lines for Tilton Terrace's nursing and direct care staff. Also attached at Tab B is a chart showing the names, titles/positions, race, and dates of hire of the relevant staff.[1] More specifically, Ms. Reczek reported to Assistant Director of Nursing Myra King (B) and Director of Nursing Angela Payson (B), and supervised the following individuals, all of whom worked on the third floor of the facility during the day shift:

|                   |     |     |
|-------------------|-----|-----|
| Dennis Dixon      | (B) | LPN |
| Caroline Njunge   | (B) | LPN |
| Bettyann Redding  | (B) | LPN |
| Evelyn Boone      | (B) | CNA |
| Caroline Connor   | (B) | CNA |
| Linda Dunn        | (B) | CNA |
| Charline Giles    | (B) | CNA |

---

[1]    A chart setting forth information on those nursing/direct care staff whose employment was terminated is attached at Tab F.

Ms. Melinda Shelton
Labor Law Enforcement Officer
May 30, 2006
Page 2

| | | |
|---|---|---|
| Maureen Henry | (B) | CNA |
| Mikki Jones | (B) | CNA |
| Cheryl Williams | (B) | CNA |
| Wanda Young | (B) | CNA |

      3.      Attached at Tab C is a chart listing discipline issued to nursing/direct care employees who failed to properly document patients' medical assessment records or otherwise record critical patient information and the supporting disciplinary documents.[2] Please note that the information provided is somewhat broader than your request; however, any failure to appropriately document critical patient information is similar for disciplinary purposes to a failure to record a doctor's order on the patient chart, and therefore we felt it was appropriate to provide this information.

      4.      Attached at Tab D are pertinent portions of the State of Delaware's annual surveys of Tilton Terrace for calendar years 2004 and 2005, specifically regarding findings on Medical Assessment Records.[3]

      5.      Attached at Tab E is a chart listing discipline issued to nurses who failed to following the applicable nursing guidelines on medication administration and the supporting disciplinary documents.

      6.      Attached at Tab F is a chart listing those nursing/direct care employees whose employment has been terminated, and the reasons for such termination as recorded by the company. Also enclosed at Tab F are disciplinary documents related to these terminations from employment. As we discussed in our telephone conversation, Red Oak Healthcare Management, Inc. first assumed the operation of Tilton Terrace effective January 1, 2004. The current management of Tilton Terrrace has maintained information on employee status in chart form (as per the attached) since that time, but does not have access to such records and/or employment files for those employees who were terminated prior to 2004. In addition, given the passage of time, some of the requested file materials have not been retained. In the event Tilton Terrace is able to locate additional file materials responsive to your request, we will be happy to provide those.

      In addition, in case this information is helpful to you, attached at Tab G is a consolidated chart, listing all discipline issued to those employees identified in response to requests number 3 and 5, as well as documentation of additional discipline given to those employee (i.e., disciplinary documents not already attached at Tabs C and E). Please note that, like Ms. Reczek, several employees received discipline for violation of the cell phone policy as well as for attendance problems.

---

2      Where applicable, the patients names have been redacted to protect their privacy.

3      The surveys in their entirety comprise over 300 pages.

Ms. Melinda Shelton
Labor Law Enforcement Officer
May 30, 2006
Page 3


    If you have any questions regarding these materials, or I can be of further
assistance, please do not hesitate to contact me.

            Very truly yours,


            Wendy K. Voss


WKV/drt
PA&C-733663v1
Enclosures

cc: Mr. John M. Hupp (w/ encl.)

# EXHIBIT "C"

**Witness Questions**
**Reczek v. Tilton Terrace**
Name: <span>██████████████████</span>
Date Interviewed: 06/29/06

1. Please give your experience, work history, length of employment with Respondent and positions held while working for Respondent. Do you currently work for Respondent? If not please explain the terms under which your employment ended. What is/was your title? What area/department do you work in? What was the name of your department? Your race?

    Nurse for 31 years, was with R for 5 years; was a charge nurse, resigned in 04 in August; worked on the nursing floor; white

2. Do you know C/P? How?

    No; the person that really needs to be interviewed is Beth Mazzatesta

3. What type of an employee was CP? Did she follow direction and follow the policies?

    N/A

4. Have you ever worked with Myra King? Have you ever worked with Angela Paylor? What are their races? What type of supervisors are they? How do they treat those that they supervise? How long have they been with the company?

    Yes, yes, black, Angie never left her office, Myra ran around and caused trouble, neither was a part of the team to help get the work done, didn't witness the events that they were issuing disciplinary actions for, if there was something wrong they would want the nurses to write people up, the nurses would write the incidents up and they would sign it, heard that this was hearsay, they would ask her to write things up and bring it to them for their signature, they would confront her as to why she was signing disciplinary actions when they had asked her to just write it up and they were going to sign it; they have both been with the company for quite some time 4-6 years; part of the reason witness resigned because Angie & Myra were on vacation - & Myra's pet CNA was involved in an incident where she was fired, when Myra came back from vacation she jumped all over this witness, because witness didn't cover for her friend and made witnesses life unbearable from that point on; Angie and Myra would always make comments like "you white girls can't cook, don't know what you are doing, etc."

5. What is the policy and procedure for using a cell phone at work? To your knowledge did CP use her cell phone at work? Did you ever witness her answer a call? How did she answer the phone and how long did she talk on the phone? Were you present at the wound care meeting on 08/04/05? Did CP take a call at that meeting? How long did she talk for? Did she leave the room or was she unprofessional in the manner in which she took the call? How do you know this?

    Not allowed to use them, n/a, yes people used them all the time even though the policy was no cell phones, CNA;s would hide and some nurses would use them, people were seen using them but weren't written up, saw a lot of white nurses chased out of there – there were black charge nurses who would see their black subordinates using cell phones and would not write them up but would write up a white nurse, n/a

6. Were you aware that CP was having problems with her daughter? Was Respondent made aware of these issues as well? Did CP request time off to deal with these issues? Did she request the time off in advance or on the day of? How do you know this?

    Would see black employees being given more leeway by Respondent and be more lenient with these black employees when they had family issues, but would see white employees dealt with more harshly than the black employees when they had family issues – Beth Mezzatesta (W/F) was dealt with very harshly when she had family issues – Shalon Giles (B/F) had family issues and was given leniency – when witness put it in writing that she had attendance issues and they gave her a hard time for putting the whole thing in writing, witness states that these disciplinary papers probably don't exist because she many times saw them tear these papers up;

    Witness stated Beth probably will not talk because she still works there periodically for the extra cash

7.  In regards to errors made at Respondent's place of business – is it common that employees fail to write Dr.'s orders or medical instructions down in the charts (MAR's)? How often would you say this happens on any given unit – 1 time a shift, 1 time a day – A few times in a week, 1 time a week, a couple of times a month, or a couple of times a year? What is the usual disciplinary action taken against an individual who fails to write these orders down? How do you know this?

    Yes, it was a weekly matter, just talk to them about it if that if the individual was black and if the individual was white they were immediately written up – like Beth once failed to transcribe – witness was instructed to write her up, wrote up one black nurse for abuse of a patient and they covered up for her; they said they would take care of it because witness was going on vacation and saw that Angie wrote a lie to the state regarding the abuse

8.  Are you aware of any medical staff member who violated company policy regarding medical treatment/care? What policy did they violate? What occurred? What is their race/gender? What type of disciplinary action was taken against them? How do you know this?

    Yes, not doing treatments and witness would frequently see that treatment (dressings) would not be changed over the weekends – mostly all black employees working on the weekends; didn't see anyone disciplined for these actions – never; would work Friday change a dressing and see the same dressing still on there Monday

9.  How much time are you given for a break? What does the policy state regarding the amount of time you are given for breaks? What is the practice (the actual amount of time a person takes a break)? What happens to an individual who does not follow the policy? How do you know this? Do you know of anyone who was written up for taking in excess of 10 minutes for a break? How much longer did they take?

    N/A

10. Who occupied CP's position before her? What was their race/gender? How did their employment end? Do you have any additional information that you know of regarding their end of employment? How do you know this?

    N/A

11. Who filled CP's position when she left? Their race/gender? How do you know this?

    N/A

12. Was CP treated more harshly than other LPN Unit Managers? How? Who was treated more favorably? Name? Race? Gender? Unit? How do you know this?

    N/A

13. Do you have any other information to add to this investigation?

    The staff was 98% black when she was there – there were like 4 -5 white employees there and they all but one were chased out except Marie because she would work the 11-7 shift and they let her do what she wanted so she would stay because they needed a nurse to work the 11-7 shift; also they would cover for those working the weekends because they didn't want to work the weekends

**Witness Questions**
**Reczek v. Tilton Terrace**
**Name:** ████████████████████████
**Date Interviewed: 06/30/06**
████████████████████████████████████████

1. Please give your experience, work history, length of employment with Respondent and positions held while working for Respondent. Do you currently work for Respondent? If not please explain the terms under which your employment ended. What is/was your title? What area/department do you work in? What was the name of your department? Your race?
Left Titlton Terrace in Dec 05, was there 81/2 F/t but now she is there per diem; LPN MDS coordinator for 1 ½ yrs; floor nurse the remainder of the time, she resigned, in the nursing department, white

2. Do you know C/P? How?
Knows her from working with her, worked directly with her, their offices were on the same floor – had daily contact and morning meetings together

3. What type of an employee was CP? Did she follow direction and follow the policies?
Unit manager, good employee – had no problems with her at all; yes; they gave her a really hard time especially Myra gave her a hard time; it was very evident that there was tension between the whites and blacks, there was a comment made during a staff meeting where Myra said you white nurses this and you white nurses that – Georgia Thomas is a RN on the 2nd floor she made a comment what are you doing with those white nurses, there was one black CAN was told to lay off her because she had issues at home but guaranteed that if it was a white CAN she would have been fired; they hounded Diane something fierce;

4. Have you ever worked with Myra King? Have you ever worked with Angela Paylor? What are their races? What type of supervisors are they? How do they treat those that they supervise? How long have they been with the company?
Yes, unfortunately , yes, both are black. Angela is the DON and Myra ADON; they suck there are more concerned with what is for lunch and not is what going on the floor they never come And help – especially Myra she avoids helping, if you are black fine if you are white they make it a lot harder on you, Angie a lot longer than Myra – 5+ for Angie and 4 years for Myra

5. What is the policy and procedure for using a cell phone at work? To your knowledge did CP use her cell phone at work? Did you ever witness her answer a call? How did she answer the phone and how long did she talk on the phone? Were you present at the wound care meeting on 08/04/05? Did CP take a call at that meeting? How long did she talk for? Did she leave the room or was she unprofessional in the manner in which she took the call? How do you know this?
   The policy is usually no cell phones on the floor – a lot of staff members have cell phones and Myra & Angie have seen staff use the cell phones, some are managers some are nurses and they are all black, nothing has ever been said to these individuals, has seen her use her cell phone at work when there were issues with her children, not one to use the cell to say hi, yes, witnessed her answer her phone during a meeting and she was on the phone less than minute (30 seconds) she said look I am in a meeting and I can't talk right now and I will call you back, it was not a conversation; the other time it was a psychologist or doctor and it was the same thing I will call you right back; yes, yes but it ended within 30 seconds; no not at all, witnessed it, has seen others take calls during staff meetings, the administrator Mr. John Hupp frequently takes calls during staff meetings and Angie has taken a call during a staff meeting

6. Were you aware that CP was having problems with her daughter? Was Respondent made aware of these issues as well? Did CP request time off to deal with these issues? Did she request the time off in advance or on the day of? How do you know this?
Yes, yes, knows through conversations with CP, and knows that CP was written up for taking time off where she was approved and then not approved – and witness had conversations with Myra or Angie where she asked them if they knew how CP was doing and how her child was doing, yes, that she can't remember and she would have to say both; spoke to CP and CP's bosses about it

7.  In regards to errors made at Respondent's place of business – is it common that employees fail to write Dr.'s orders or medical instructions down in the charts (MAR's)? How often would you say this happens on any given unit – 1 time a shift, 1 time a day – A few times in a week, 1 time a week, a couple of times a month, or a couple of times a year? What is the usual disciplinary action taken against an individual who fails to write these orders down? How do you know this?

Yes, 1-2 times a week, quite a few people forget to write down orders, what is suppose to happen is that the person is written up but witness states she has written people up for not writing down orders and saw Angie tear up the write up; this happened when she wrote up a LPB and RNs and they were all black; know this because she saw Angie tear up the write ups

8.  Are you aware of any medical staff member who violated company policy regarding medical treatment/care? What policy did they violate? What occurred? What is their race/gender? What type of disciplinary action was taken against them? How do you know this?

Yes, most definitely – Georgia Thomas and Shandra  - both it was verbal abuse; they talked about them behind their back they yelled at them and talked very badly to them; Georgia is black and Shandra is Indian – not white; nothing not a dam thing, they were never suspended, and she witnessed them verbally abuse this patient and witness stated she went down to Angie and Myra and made them aware of this and they said they knew about it and were handling it

9.  How much time are you given for a break? What does the policy state regarding the amount of time you are given for breaks? What is the practice (the actual amount of time a person takes a break)? What happens to an individual who does not follow the policy? How do you know this? Do you know of anyone who was written up for taking in excess of 10 minutes for a break? How much longer did they take?

By law 30 minute lunch, and they were allowed to take two 15 minute break, believes company policy states 30 minutes for lunch and is not aware of the other breaks; most people took 15 minutes and more, people would disappear for in excess of 15 minutes and nothing was said to these individuals , witness took these issues to Myra and Angie but nothing was ever done, nothing would happen to a person who didn't follow policy, unless they were white or Diane, knows this because she has seen it all going on; everyone is lazy on the floor and they all rely on the unit managers, Georgia the black RN could do no RN, Diane took 10 minutes and got called back on the floor and then she went back out for another 5 minutes and she got harassed, witness stated that when she would go down to the 2nd floor she wouldn't find her there she would find her on the first floor or in Angie's office, doesn't know of anyone who was written up for taking more than 15 minutes, 15-30 minutes

10. Who occupied CP's position before her? What was their race/gender? How did their employment end? Do you have any additional information that you know of regarding their end of employment? How do you know this?

Ann Van Curien, W/F, she resigned, no, worked there

11. Who filled CP's position when she left? Their race/gender? How do you know this?

A black/female nurse – RN, now it is a white RN the white RN took over about 1-2 months ago; worked there; witness stated she had inquired about filling Diane's position and they wouldn't give it to her they hired the black RN

12. Was CP treated more harshly than other LPN Unit Managers? How? Who was treated more favorably? Name? Race? Gender? Unit? How do you know this?

        Yes absolutely, without a doubt, via harassment, if you were black you were treated more favorably – especially Georgia, black, female, saw it going on

13. Do you have any other information to add to this investigation?

        The harassment lead to her resignation, Myra needs to learn how to talk to staff especially white nurses – much more so – more prevalent towards the white nurses,



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*

July 10, 2006

Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Attn.: Wendy K. Voss, Esquire

## VIA FASCIMILE AND REGULAR MAIL

Re:     Reczek v. Tilton Terrace
        Case Number: 05110541W/17C-2006-00098
        Notice of Preliminary Determination; Right to Respond

Dear Ms. Voss:

As you are aware, the above referenced discrimination charge that was filed with this agency has been assigned to me for investigation. I am writing to review the evidence gathered thus far, and to give you an opportunity to respond to the information at hand.

Charging Party alleges she was discriminated against based upon her race (W) when she was harassed in the workplace and held to a higher standard than her similarly situated coworkers outside her protected class (B). Charging Party further alleges that she was subjected to racial derogatory comments by her coworkers. Charging Party alleges she brought these issues to her supervisor's attention but no action was taken to eliminate the harassment which resulted in her constructive discharge.

Respondent denies the discrimination. Respondent states that Charging Party violated company policy on more than one occasion and was taken through Respondent's progressive disciplinary process. Respondent further stated that the violations committed by Charging Party were of a serious enough nature to render the disciplinary action taken against her. Respondent states that Charging Party was held to a higher standard because she held a supervisory position and was expected to set a positive example for all other employees. Finally, Respondent states that Charging Party never made any complaints of harassment or discrimination to Respondent during her tenure.

Respondent was sent a request for additional information in May 2006, to which Respondent provided as complete a response as possible due to ownership in the company changing. In this response, Respondent provided documentation of other individuals past and present employees who have been disciplined for their infractions of company policy. Analyzing this information revealed that there are a number of employees outside Charging Party's protected class who have not been as severely disciplined for their actions and have not been taken through the disciplinary process in the same manner as Charging Party. This information corroborates Charging Party's allegations that she was treated less favorably than

Ms. Wendy K. Voss
July 10, 2006
Page Two

her similarly situated coworkers. In addition, a few witnesses have confirmed this allegation in that on more than one occasions employees have committed infractions, management was well aware of these infractions and no disciplinary actions was taken or the disciplinary actions was destroyed. Also, Respondent only provided disciplinary action for one other individual of another protected class who violated the cell phone use policy for being seen several times using the cell phone. In addition, this disciplinary action was issued by E. Robert who is not listed on the organizational chart or the list of employees within Charging Party's work area. Witnesses further corroborate Charging Party's allegations in that while the policy is in writing the practice was quite different. Witnesses testified that numerous employees including Charging Party's similarly situated coworkers, subordinates and supervisors are frequently seen using cell phones at work and are not disciplined for these actions. In regards to giving out improper medication, failure to follow Respondent's policies regarding medical treatment and the failure to correctly document a chart which resulted in Charging Party being suspended for three days; the information submitted by Respondent demonstrates that other employees outside Charging Party's protected class have been treated more favorably in similar situations. Those two individuals are Betty Redding (B) and Zahra Mohamed (B) both of which were not taken through Respondent's progressive disciplinary process as it is written. In regards to the number of occurrences that happen at Respondent's place of business where improper medications are issued, policies on medical treatment was not followed and employees failed to correctly document a chart; that information was not clearly or directly presented in Respondent's response of May 30, 2006. Respondent provided documentation to demonstrate that there are many instances where verbal and written warnings were issued for these offenses. Witnesses, however, testified that these issues occurred on about a weekly basis and that on numerous occasions individuals were not issued disciplinary actions for these violations. Witnesses further testified that there were some instances of a serious nature which were brought to management's attention and Respondent failed to issue disciplinary action when the violators were outside Charging Party's protected class. Finally, witnesses corroborated Charging Party's allegations that CP was subjected to racial derogatory comments on more than one occasion and management was aware of these comments.

Therefore, evidence demonstrates that Charging Party was treated less favorably than her similarly situated coworkers in similar situations and witnesses have supported Charging Party's allegations of race discrimination. Therefore, based on the above data, there is evidence to support the allegation of discrimination based on race. If you wish to provide a response along with any supportive documentation that have not yet been provided you must do so by July 21, 2006. Otherwise, a cause finding decision will be made based on the information currently in the file. As the investigator, I would like to let you know that this office encourages settlement discussions at all stages of the administrative process. Toward that end, I am available to assist you with settlement attempts any time before a finding is issued in this case. I may be reached at the above address or by telephone at 761-8205.

Sincerely,

Melinda Shelton
Labor Law Enforcement Officer
Office of Labor Law Enforcement



Potter
Anderson
Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**Wendy K. Voss**
**Partner**
Attorney at Law
wvoss@potteranderson.com
302 984-6076 Direct Phone
302 658-1192 Fax

July 21, 2006

Ms. Melinda Shelton
Labor Law Enforcement Officer
Office of Labor Law Enforcement
Department of Labor, Division of Industrial Affairs
4425 North Market Street
Wilmington, Delaware 19802

### Re: Diane E. Reczek v. Tilton Terrace; Case No.: 05110541W/17C-2006-00098

Dear Ms. Shelton:

Thank you for your leter of July 10, 2006, which I have forwarded to my client.

I am writing to advise you that I am withdrawing my appearance on behalf of Tilton Terrace in the referenced matter. I understand that John M. Hupp, Administrator of the Tilton Terrace facility (tel. 652-3861) will be in touch with you in the near future regarding the matters addressed in your letter.

Sincerely yours,

Wendy K. Voss

WKV/drt
PA&C-742275v1

cc: Mr. John M. Hupp

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM

Diane E. Reczek                                      Case No. 05110541W
30 Mary Drive
Aston, PA 19014

vs.

TILTON TERRACE
801 N. Broom St.,
Wilmington, DE 19806

### FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

#### *Reasonable Cause Determination and Notice of Mandatory Conciliation.*

In this case, the Department has completed its investigation and found that there is reasonable cause to believe that an unlawful employment practice has occurred. Under the provisions of the law, the parties are now required to engage in mandatory conciliation with . Please be prepared to appear for conciliation on the following date and time: **Thursday, August 17, 2006 @ 11am** at the location of **DDOL Labor Law Enforce, 4425 Market Street, Wilmington, DE 19802.**

Your cooperation and good faith effort is anticipated. Your corresponding Delaware Right to Sue Notice will be effective one day after your compliance with the conciliation effort.

The reasonable cause finding is based primarily on the following facts:

In this discrimination case, Charging Party must show that Respondent issued disciplinary actions against her and swiftly moved her through the progressive disciplinary process because of her race. She can show this by demonstrating that she was treated more harshly than her similalrly situated coworkers of another race under simialr circumstances. The evidence and information provided reveals that Respondent did not discipline black employees at all or as harshly for their infractions of the company policies. Evidence and information further reveals that Respondent also did not always follow their progressive disciplinary process with employees outside Charging Party's protected class. Finally, witnesses fully corroborated Charging Party's allegations of race discrimination. Therefore, Charging Party has established that illegal race discrimination occurred.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program. See the attached Notice of Rights.

_7/31/06_____                          _for JKC, MJ. Sorenser_____
Date issued                                    Julie Klein Cutler, Administrator

_8/17/06_____                          _Julie Klein Cutler_____
Date conciliation completed                    Julie Klein Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

Richard H. Cross, Jr.
Christopher P. Simon
Nancy Walsh Law
Donna L. Harris
Amy E. Evans
Erica N. Finnegan
Charles T. Williams, III
Sean T. O'Kelly
Kristen Healey Cramer
Kevin S. Mann

**CROSS & SIMON, LLC**
ATTORNEYS AT LAW
913 NORTH MARKET STREET
11TH FLOOR
WILMINGTON, DELAWARE 19801
302-777-4200 / 302-777-4224 (FAX)
e-mail: kmann@crosslaw.com
www.crosslaw.com

MAILING ADDRESS:
P.O. BOX 1380
WILMINGTON, DE 19899-1380

February 2, 2007

John G. Hupp
Red Oak Healthcare Management
2800 Wildwood Ave.
Jackson, MI 49202

Re:   **JHA Wilmington d/b/a Tilton Terrace**

Dear Mr. Hupp:

Please countersign this letter confirming that the law firm of Cross & Simon, LLC has been retained to represent JHA Wilmington Inc. d/b/a Tilton Terrace in defending it in a lawsuit filed by Ms. Diane E. Reczek in the United States District Court of the District of Delaware, Civil Action No. 07-00013-GMS, alleging violations under Title VII and other statutes related to Ms. Reczek's employment by JHA Wilmington Inc. d/b/a Tilton Terrace.

All other terms set forth in our engagement letter of August 18, 2006 shall apply to this action.

Sincerely yours,

Kevin S. Mann

_____
John G. Hupp, on behalf of JHA
Wilmington, Inc. d/b/a Tilton Terrace

2-2-07
Date

# EXHIBIT "D"

**BOOTHWYN**
**PHARMACY, INC.**
EST. 1949     DEA# 8M310692
Boothwyn, PA., USA 19061
George A. Panarello, Pndr.

**(610) 485-1130**

## ALPRAZOLAM 0.5MG TABLET

RX #    4037084X                              12/16/05

..Seek immediate help if
..overdose is suspected
..Do not use more or less
..often than doctor said
..May make you sleepy; Use
..caution driving

RECZEK, DIANA E                 TOTAL      11.50*
30 MARY DRIVE
ASTON, PA 19014

**ALPRAZOLAM 0.5MG TABLET**          15 TAB
    00781-1077-10
ORG DT- 07/14/05

DR.MOTEL, M.
736 BALTIMORE PIKE
CONCORDVILLE, PA 19331
610-459-3862

THIS IS YOUR RECEIPT. PLEASE RETAIN FOR YOUR TAX OR INSURANCE.

# University of Pennsylvania Health System

09/27/2005

Melissa Broyles, M.D.
1440 Conchester Highway
Suite 10c
Boothwyn, PA 19061

Re:    Diane Reczek
ID # :  010838852

Dear Dr. Broyles,

Thank you for referring Diane Reczek to me today for Colonoscopy.

The indications for the procedure were:

- Diarrhea
- A positive family history of colonic polyps

The patient tolerated the procedure well and there were no complications.

Impressions included:

- Normal colonoscopic examination
- Cecal biopsies taken to rule out microscopic colitis

Recommendations to the patient included:

- Follow-up with Melissa Broyles, M.D..
- Repeat colonoscopy in 5 to 10 years.

Thank you for the opportunity to assist in the care of this patient.  Please feel free to contact me if I can be of further assistance to you.  My office phone numbers are:  Hospital University of Pennsylvania - 215-349-8222, Pennsylvania Medical Center at Radnor - 610-902-1500, Presbyterian Medical Center - 215-662-8900.

Sincerely,


Sanford Herold, M.D.

# University of Pennsylvania Health System

## Colonoscopy Procedure Report

**Patient:** Diane Reczek
**Patient ID:** 010838852
**Endoscopist:** Sanford Herold, M.D.

**Exam Date:** 09/27/2005
**Referring Physician:** Melissa Broyles, M.D.

INTRODUCTION:
44 year old female patient presents for an elective outpatient colonoscopy. The indications for the procedure were diarrhea and a positive family history of colonic polyps.

CLINICAL HISTORY & PHYSICAL EXAMINATION:
The patient's clinical history and physical examination were performed and are documented in the nursing record.

CONSENT:
The benefits, risks, and alternatives to the procedure were discussed and informed consent was obtained.

PREPARATION:
EKG, pulse and blood pressure monitored.

MEDICATIONS: As per anesthesia

PROCEDURE:
Rectal exam: Normal.
The endoscope was passed without difficulty under direct visualization to the terminal ileum. Retroflexion was performed. I was present for the insertion, viewing and removal of the endoscope.

FINDINGS: The colonic mucosa appeared entirely normal. Multiple random cold biopsies were obtained in the cecum. There was no evidence of masses or polyps. There were no hemorrhoids, diverticular disease or vascular abnormalities noted.

IMPRESSION:
1. Normal colonoscopic examination. 45.23*.
2. Cecal biopsies taken to rule out microscopic colitis. .

RECOMMENDATION:
- Follow-up with Melissa Broyles, M.D..
- Repeat colonoscopy in 5 to 10 years.



Sanford Herold, M.D.



2 appendiceal orifice



4 Terminal Ileum



5 Ileocecal valve

# University of Pennsylvania Health System

## Colonoscopy Procedure Report

**Patient:**      Diane Reczek
**Patient ID:**   010838852
**Endoscopist:**  Sanford Herold, M.D.

**Exam Date:**           09/27/2005
**Referring Physician:** Melissa Broyles, M.D.



6 Rectum

09/27/2005

# University of Pennsylvania Health System

## *Patient Instructions for Colonoscopy with Biopsy*

| | | | |
|---|---|---|---|
| **Patient:** | Diane Reczek | **Exam Date:** | 09/27/2005 |
| **Patient ID:** | 010838852 | **Referring Physician:** | Melissa Broyles, M.D. |
| **Endoscopist:** | Sanford Herold, M.D. | | |

The impressions for your procedure include:
- **Normal colonoscopic examination**
- **Cecal biopsies taken to rule out microscopic colitis**

The recommendations for your procedure include:
- **Follow-up with Melissa Broyles, M.D..**
- **Repeat colonoscopy in 5 to 10 years.**

Because medications provided during the procedure may cause drowsiness, weakness and lack of coordination, DO NOT operate motorized vehicles, use dangerous equipment such as power tools, mowers, etc., and do not conduct important business or sign any legal documents until the following day after the procedure.

In order to prevent complications, please follow these precautionary instructions:

If you experience redness or swelling at locations where medications were given, place a warm wet washcloth over the affected area for twenty minutes at a time, until the locations redness or swelling subsides. If symptoms continue for 2-3 days, please call us at Hospital of the University of Pennsylvania - 215-349-8222, University of Pennsylvania Health Systems at Radnor - 610-902-1500, University of Pennsylvania Health Systems at Presbyterian Medical Center - 215-662-8900.

If you experience bleeding from the rectum, or have dark bowel movements, please contact your physician.

If you are persistently nauseous, experience vomiting, abdominal pain, fainting, black stool, or passage of blood in the stool in addition to vomiting, please contact your physician immediately.

If your temperature increases greater than 101 degrees, call your physician.

Avoid aspirin, Anacin, Bufferin, Alka Seltzer or any medication containing aspirin for one week. If needed, you may take Tylenol or Datril.

You may contact the Endoscopy Lab at HUP - 215-349-8222, Radnor - 610-902-1500, Presbyterian - 215-662-8900.

If you notice blood in your stool for more than one or two bowel movements after your procedure, or if you should become constipated (no bowel movement) for two days or more, or if abdominal pain (gas cramps are normal on the day of the procedure) develops, please contact your physician.

_____

Patient's Signature

# University of Pennsylvania Health System

## *Patient Instructions for EGD with Biopsy*

**Patient:**        Diane Reczek                        **Exam Date:**              09/27/2005
**Patient ID:**     010838852                           **Referring Physician:**    Melissa Broyles, M.D.
**Endoscopist:**    Sanford Herold, M.D.

The impressions for your procedure include:
- **Mild esophagitis**
- **Biopsies taken from second portion of duodenum to evaluate for sprue**

The recommendations for your procedure include:
- **Follow-up with Melissa Broyles, M.D..**

Because medications provided during the procedure may cause drowsiness, weakness and lack of coordination, DO NOT operate motorized vehicles, use dangerous equipment such as power tools, mowers, etc., and do not conduct important business or sign any legal documents until the following day after the procedure.

In order to prevent complications, please follow these precautionary instructions:

If you experience redness or swelling at locations where medications were given, place a warm wet washcloth over the affected area for twenty minutes at a time, until the locations redness or swelling subsides. If symptoms continue for 2-3 days, please call us at Hospital of the University of Pennsylvania - 215-349-8222, University of Pennsylvania Health Systems at Radnor - 610-902-1500, University of Pennsylvania Health Systems at Presbyterian Medical Center - 215-662-8900.

If you experience bleeding from the rectum, or have dark bowel movements, please contact your physician.

If you are persistently nauseous, experience vomiting, abdominal pain, fainting, black stool, or passage of blood in the stool in addition to vomiting, please contact your physician immediately.

If your temperature increases greater than 101 degrees, call your physician.

Avoid aspirin, Anacin, Bufferin, Alka Seltzer or any medication containing aspirin for one week. If needed, you may take Tylenol or Datril.

You may contact the Endoscopy Lab at HUP - 215-349-8222, Radnor - 610-902-1500, Presbyterian - 215-662-8900.

If you notice blood in your stool for more than one or two bowel movements after your procedure, or if you should become constipated (no bowel movement) for two days or more, or if abdominal pain (gas cramps are normal on the of the procedure) develops, please contact your physician.

_____

Patient's Signature

# University of Pennsylvania Health System

## EGD Procedure Report

| | |
|---|---|
| **Exam Date:** | 09/27/2005 |
| **Referring Physician:** | Melissa Broyles, M.D. |

**Patient:** Diane Reczek
**Patient ID:** 010838852
**Endoscopist:** Sanford Herold, M.D.

**INTRODUCTION:**
44 year old female patient presents for an elective outpatient EGD. The indications for the procedure were GERD symptoms and diarrhea.

**CLINICAL HISTORY & PHYSICAL EXAMINATION:**
The patient's clinical history and physical examination were performed and are documented in the nursing record.

**CONSENT:**
The benefits, risks, and alternatives to the procedure were discussed and informed consent was obtained.

**PREPARATION:**
EKG, pulse and blood pressure monitored.

**MEDICATIONS:** As per anesthesia

**PROCEDURE:**
The endoscope was passed without difficulty under direct visualization to the 2nd portion of the duodenum. Retroflexion was performed. I was present for the insertion, viewing and removal of the endoscope.

**FINDINGS:**
HYPOPHARYNX: The hypopharynx appeared normal.
ESOPHAGUS: Patchy superficial areas of erythema consistent with mild reflux esophagitis. Refer to photographs numbered: 7 and 9. The esophagus was otherwise normal.
GE-JUNCTION: The gastroesophageal junction appeared normal.
STOMACH: The stomach appeared normal and there was no evidence of gastritis, gastric ulcers, gastric varices, angiodysplastic lesions, hiatal hernia, intrinsic masses, extrinsic compression, gastric polyps or bleeding. The gastric folds were of normal size, gastric motility was grossly normal and no surgical changes were appreciated.
PYLORUS: The pylorus appeared normal.
DUODENUM: The duodenum appeared normal and there was no evidence of duodenitis, duodenal ulcers, nodules, diverticula, intrinsic or extrinsic masses, polyps, or arteriovenous malformation (AVM's). Multiple random cold biopsies were obtained in the 2nd portion of the duodenum.

**IMPRESSION:**
1. Mild esophagitis.
2. Otherwise normal.
3. Biopsies taken from second portion of duodenum to evaluate for sprue.

**RECOMMENDATION:**
- Follow-up with Melissa Broyles, M.D..

Sanford Herold, M.D.

09/2

# University of Pennsylvania Health System

## EGD Procedure Report

**Patient:** Diane Reczek
**Patient ID:** 010838852
**Endoscopist:** Sanford Herold, M.D.

**Exam Date:** 09/27/2005
**Referring Physician:** Melissa Broyles, M.D.



2 Antrum



3 duodenum
2nd Portion Duodenum



4 Duodenal bulb



5 Angulus



6 Gastroesophageal junction
Cardia



7 Esophagitis/Erythema
Distal Esophagus



9 Esophagitis/Erythema
Distal Esophagus

# EXHIBIT "E"

CO   FILE  DEPT  CLOCK NUMBER   006
XPL  000366 006123       0000014748  1

# Earnings Statement

JHA WILMINGTON INC.
9230 CEDAR KNOLL DRIVE
GRASS LAKE, MI 49240

Period Ending:   10/08/2005
Pay Date:        10/14/2005

Taxable Marital Status: Single
Exemptions/Allowances:
   Federal:  2
   State:    2

DIANE RECZEK
30 MARY DRIVE
ASTON, PA 19014

Social Security Number: ▮▮▮▮▮▮

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 28.7500 | 8.25 | 237.19 | 36,907.84 |
| Paid Time Off | 28.7500 | 8.00 | 230.00 | 3,910.00 |
| Overtime | | | | 1,498.61 |
| Bonus | | | | 300.00 |
| Differentials | | | | 68.25 |
| Sign On Bonus | | | | 1,500.00 |
| Weknd Prmium | | | | 23.00 |
| **Gross Pay** | | | **$467.19** | 44,897.70 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Social Security Tax | -20.29 | 2,731.64 |
| | Medicare Tax | -4.74 | 638.85 |
| | Federal Income Tax | | 6,836.73 |
| | DE State Income Tax | | 1,840.90 |
| | **Other** | | |
| | Pretax - Dental | -15.26* | 91.56 |
| | Pretax - Health | -124.56* | 747.36 |
| | **Net Pay** | | **$302.34** |

**\* Excluded from federal taxable wages**
  Your federal taxable wages this period are $327.37



| Other Benefits and Information | this period | total to date |
|---|---|---|
| Pto Balance: | | -4.33 |

## Time Card Detail

| DATE | | IN | OUT | IN | OUT | TOTAL |
|---|---|---|---|---|---|---|
| Sun | 09/25 | NO PUNCHES | | | | |
| Mon | 09/26 | NO PUNCHES | | | | |
| Tue | 09/27 | NO PUNCHES | | | | |
| Wed | 09/28 | 6:54am | 3:46pm | | | 8.25 |
| Thu | 09/29 | NO PUNCHES | | | | |
| Fri | 09/30 | NO PUNCHES | | | | |
| Sat | 10/01 | NO PUNCHES | | | | |
| Sun | 10/02 | NO PUNCHES | | | | |
| Mon | 10/03 | NO PUNCHES | | | | |
| Tue | 10/04 | NO PUNCHES | | | | |
| Wed | 10/05 | NO PUNCHES | | | | |
| Thu | 10/06 | NO PUNCHES | | | | |
| Fri | 10/07 | NO PUNCHES | | | | |
| Sat | 10/08 | NO PUNCHES | | | | |

©2001 Automatic Data Processing, Inc.

TEAR HERE

Safe, accurate,  Visit the IRS Website
FAST! Use  at www.irs.gov.

**Employee Reference Copy**

# W-2 Wage and Tax Statement **2005**

Copy C for employee's records    OMB No. 1545-0008

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000368 09/XPL | 006123 | T | 141 |

c  Employer's name, address, and ZIP code

JHA WILMINGTON INC
1010 N. BROOM ST.
WILMINGTON DE 19806

Batch #00986

e/f Employee's name, address, and ZIP code

DIANE RECZEK
30 MARY DRIVE
ASTON,PA 19014

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 16-1670495 | |

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 44058.78 | 6836.73 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 44058.78 | 2731.64 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 44058.78 | 638.85 |

| 7 Social security tips | 8 Allocated tips |
|---|---|
| | |

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|
| | |

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|
| | |

| 14 Other | 12b |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| DE | 1161670495001 | 44058.78 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 1840.90 | |

| 19 Local income tax | 20 Locality name |
|---|---|
| | |

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2005 pay stub plus any adjustments submitted by your employer.

| | | | | | |
|---|---|---|---|---|---|
| Gross Pay | 44897.70 | Social Security Tax Withheld Box 4 of W-2 | 2731.64 | DE. State Income Tax SUI/SDI Box 14 of W-2 | 1840.90 |
|  | Box 17 of W-2 | | | | |
| Fed. Income Tax Withheld Box 2 of W-2 | 6836.73 | Medicare Tax Withheld Box 6 of W-2 | 638.85 | | |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | DE. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 44,897.70 | 44,897.70 | 44,897.70 | 44,897.70 |
| Less Misc. Non Taxable Comp. | 838.92 | 838.92 | 838.92 | 838.92 |
| Reported W-2 Wages | 44,058.78 | 44,058.78 | 44,058.78 | 44,058.78 |

3. Employee W-4 Profile. To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

DIANE RECZEK
30 MARY DRIVE
ASTON,PA 19014

Social Security Number:
Taxable Marital Status: SINGLE
Exemptions/Allowances:
FEDERAL: 2
STATE:  2

© 2005 AUTOMATIC DATA PROCESSING, INC.

— Fold and Detach Here —

**Left form:**

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| 58197.46 | 7707.91 |
| 3 Social security wages | 4 Social security tax withheld |
| 58197.46 | 3608.24 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 58197.46 | 843.86 |

| a Employee's SSA number | Employer use only |
|---|---|

| b Employer's FED ID number | d Control number |
| 23-6003046 | 00110033 |

c Employer's name, address, and ZIP code

County of Delaware
201 West Front Street
Media PA 19063

| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |

| 13 Statutory employee | Retirement plan | Third-Party Sick pay | 12b |
|---|---|---|---|
| | X | | |

| 14 Other | 12c |
| PA SUI    52.38 | 12d |

e Employee's first name and initial    Last name    Suff.

Diane E Reczek
30 Mary Drive
Aston PA 19014

f Employee's address and ZIP code

| 15 State PA | Employer's state ID 1566 2828 | 18 Local wages, tips, etc |
| 16 State wages, tips, etc. 58197.46 | 19 Local income tax |
| 17 State income tax 1786.70 | 20 Locality name |

| Form W-2 | OMB. No. 1545-0008 Wage and Tax Statement 2007 | Dept. of the Treasury - Internal Revenue Service |

Copy B To Be Filed With Employee's FEDERAL Tax Return

---

**Right form:**

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| 58197.46 | 7707.91 |
| 3 Social security wages | 4 Social security tax withheld |
| 58197.46 | 3608.24 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 58197.46 | 843.86 |

| a Employee's SSA number | Employer use only |
|---|---|

| b Employer's FED ID number | d Control number |
| 23-6003046 | 00110033 |

c Employer's name, address, and ZIP code

County of Delaware
201 West Front Street
Media PA 19063

| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |

| 13 Statutory employee | Retirement plan | Third-Party Sick pay | 12b |
|---|---|---|---|
| | X | | |

| 14 Other | 12c |
| PA SUI    52.38 | 12d |

e Employee's first name and initial    Last name    Suff.

Diane E Reczek
30 Mary Drive
Aston PA 19014

f Employee's address and ZIP code

| 15 State PA | Employer's state ID 1566 2828 | 18 Local wages, tips, etc |
| 16 State wages, tips, etc. 58197.46 | 19 Local income tax |
| 17 State income tax 1786.70 | 20 Locality name |

| Form W-2 | OMB. No. 1545-0008 Wage and Tax Statement 2007 | Dept. of the Treasury - Internal Revenue Service |

Copy 2 To Be Filed With Employee's CITY or LOCAL Income Tax Return

FORM L4BL

EXHIBIT "F"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE RECZEK, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO: 07-00013 (GMS) |
| | : | |
| JHA WILMINGTON, INC., | : | |
| | : | |
| Defendants. | : | |

### AFFIDAVIT OF COUNSEL

State of Delaware   :
               : ss
New Castle County  :

I, G. Kevin Fasic, Esquire, do hereby depose and state as follows:

1. I am an adult individual, a member of the Delaware Bar, and counsel for the plaintiff, Ms. Diane Reczek ("Ms. Reczek"). I am authorized to make this Affidavit.

2. In connection with Ms. Reczek's Motion for Default Judgment, demand is made for the recovery of Ms. Reczek's reasonable attorney's fees and costs of this action. This Affidavit concerns solely her attorney's fees and costs for local counsel, and a separate submission is being made for the fees and costs incurred by her lead counsel, Kevin I. Lovitz, Esquire, of the Lovitz Law Firm in Philadelphia, Pennsylvania.

3. The recovery of attorney's fees and costs is authorized by 42 U.S.C. § 2000e-5(k).

4. At the time this action was commenced and through the entry of default I am charged my time at the rate of $225.00 per hour for my services, and $125.00 per hour for the services of my legal assistant. I am currently charging an hourly rate of $250, and $135 for my legal assistant.

1

5.     Attached hereto is a copy of my firm's Time and Expense Report for this matter, showing

charges incurred for both costs and expenses through June 10, 2008 of $9,419.35.

Further affiant sayeth not,

G. Kevin Fasic, Esquire (DE 3496)

SWORN TO AND SUBSCRIBED before me, a Notary Public of the State and

County aforesaid, this 11th day of June, 2008.

Notary Public

JAIME L. TOBLER
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires July 31, 2008

2

Matter Time and Expense (with memo)

**Matter ID:** 1178-CONT:
**Matter Name:** Diane Reczek v. Tilton Terrace
**Contract Amount:** $ 0.00
**Printed on:** 6/11/2008

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|------|--------|-------------|-------|-------------|----------|
| **Services:** | | | | | |
| 11/30/2006 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Reczek: Telephone call with Pennsylvania counsel | | | |
| 12/8/2006 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Telephone call with co-counsel | | | |
| 12/9/2006 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Draft representation letter | | | |
| 12/14/2006 | JT | RESEARCH | 0.20 | 0.20 | $25.00 |
| | | Research Delaware Secretary of State for information on Tilton Terrace, Tilton Terrace of Delaware and JHA Wilmington. | | | |
| 1/4/2007 | GKF | Draft/Revise | 1.80 | 1.80 | $405.00 |
| | | Review and make revisions to complaint | | | |
| 1/6/2007 | GKF | Draft/Revise | 1.40 | 1.40 | $315.00 |
| | | Revise complaint, e-mail revisions to co-counsel with questions | | | |
| 1/8/2007 | GKF | Draft/Revise | 1.10 | 1.10 | $247.50 |
| | | Review e-mail from co-counsel with comments on draft, revise draft accordingly and e-mail to co-counsel; Review and revise final version for filing | | | |
| 1/8/2007 | JT | Draft/Revise | 1.40 | 1.40 | $175.00 |
| | | Draft Civil Cover Sheet; Draft Summons; Prepare filing fee; Attach exhibit to Complaint; Prepare for filing. | | | |
| 1/8/2007 | JT | RESEARCH | 0.30 | 0.30 | $37.50 |
| | | Internet search for Registered Agent information on Tilton Terrace; Retrieve status and history report from Delaware Secretary of State. | | | |
| 1/9/2007 | JT | Draft/Revise | 0.60 | 0.60 | $75.00 |
| | | Revise summons; Revise Civil Cover Sheet; Prepare cd with pdf of all documents; Arrrange for hand delivery to District Court | | | |
| 1/11/2007 | JT | File | 0.30 | 0.30 | $37.50 |
| | | Receipt of served Summons; Scan summons; Electronically file with Court. | | | |
| 1/25/2007 | GKF | Communicate | 1.20 | 1.20 | $270.00 |
| | | Telephone call from opposing counsel regarding extension and status of defendants; e-mails regarding extension and stipulation with co-counsel and opposing counsel | | | |
| 1/26/2007 | GKF | Communicate | 1.50 | 1.50 | $337.50 |
| | | E-Mail with opposing counsel regarding lease; forward to co-counsel; Calls with opposing counsel regarding dismissal of LLC; Review filed stipulation and forward to co-counsel | | | |

Matter Time and Expense (with memo)

Matter ID:          1178-CONT:
Matter Name:        Diane Reczek v. Tilton Terrace
Contract Amount:    $ 0.00
Printed on:         6/11/2008

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|------|--------|-------------|-------|-------------|----------|
| 2/1/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Exchange e-mails with co-counsel regarding settlement | | | |
| 2/5/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Telephone call to LLC counsel; E-Mail with co-counsel regarding same | | | |
| 2/6/2007 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Exchange e-mails with co-counsel and opposing counsel | | | |
| 2/9/2007 | GKF | Communicate | 0.90 | 0.90 | $202.50 |
| | | Telephone call with opposing counsel; Review Position Statement | | | |
| 2/13/2007 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Review answer and forward to co-counsel by e-mail | | | |
| 2/15/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | E-Mails and voice mails with co-counsel and opposing counsel | | | |
| 2/16/2007 | GKF | Communicate | 1.40 | 1.40 | $315.00 |
| | | Review court order regarding LLC; E-Mails and lengthy conversation with co-counsel regarding status of LLC as party and settlement issues; Call to opposing counsel regarding settlement | | | |
| 2/19/2007 | GKF | REVIEW | 0.20 | 0.20 | $45.00 |
| | | Review and revise Notice of Dismissal for LLC | | | |
| 2/19/2007 | JT | Draft/Revise | 0.40 | 0.40 | $50.00 |
| | | Draft Notice of Voluntary Dismissal; Draft Certificate of Service for same; Prepare for attorney review. | | | |
| 2/19/2007 | JT | Draft/Revise | 0.10 | 0.10 | $12.50 |
| | | Revise per attorney comments. | | | |
| 2/20/2007 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Telephone call with opposing counsel; E-Mail with co-counsel | | | |
| 2/20/2007 | JT | PREPARE | 0.20 | 0.20 | $25.00 |
| | | Call to Court regarding filing Notice of Voluntary Dismissal to dismiss defendant Tilton Terrace; Prepare for filing and service on all parties. | | | |
| 2/28/2007 | JT | RESEARCH | 0.20 | 0.20 | $25.00 |
| | | Obtain copy of Judge Sleets' Policies and Procedures; Email copy to co-counsel; Download copy to file. | | | |
| 3/6/2007 | GKF | Communicate | 0.40 | 0.40 | $90.00 |
| | | E-Mail with co-counsel; Telephone call with opposing counsel regarding settlement | | | |
| 3/7/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |

Matter Time and Expense (with memo)

Matter ID: **1178-CONT:**
Matter Name: **Diane Reczek v. Tilton Terrace**
Contract Amount: **$ 0.00**
Printed on: **6/11/2008**

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|------|--------|-------------|-------|-------------|----------|
| | | Telephone call with co-counsel | | | |
| 3/12/2007 | GKF | Communicate | 0.40 | 0.40 | $90.00 |
| | | Telephone call with client and co-counsel | | | |
| 3/16/2007 | GKF | Communicate | 1.70 | 1.70 | $382.50 |
| | | Telephone call with co-counsel; Review client documents; Telephone conference with client and co-counsel; Call opposing counsel regarding settlement | | | |
| 3/20/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Telephone call with opposing counsel regarding settlement | | | |
| 3/22/2007 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Telephone call with opposing counsel regarding settlement | | | |
| 3/22/2007 | JT | Communicate | 0.10 | 0.10 | $12.50 |
| | | Call to co-counsel regarding offer that was received yesterday. | | | |
| 3/23/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Call co-counsel regarding settlement offer | | | |
| 3/26/2007 | GKF | Communicate | 0.40 | 0.40 | $90.00 |
| | | Call and e-mail with co-counsel; Call to opposing counsel | | | |
| 3/30/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Call with opposing counsel regarding settlement | | | |
| 4/10/2007 | GKF | Communicate | 0.30 | 0.30 | $67.50 |
| | | Telephone call with opposing counsel; E-Mail with co-counsel | | | |
| 4/11/2007 | GKF | Communicate | 0.70 | 0.70 | $157.50 |
| | | Calls with co-counsel and opposing counsel regarding settlement | | | |
| 4/12/2007 | GKF | Communicate | 0.90 | 0.90 | $202.50 |
| | | Review court docket; Call counsel for judgment creditor of JHA; E-Mail with co-counsel; Call opposing counsel | | | |
| 4/13/2007 | GKF | Communicate | 0.50 | 0.50 | $112.50 |
| | | E-Mail and call with Tilton Terrace attorney; E-Mail dismissal documents to same; Call opposing counsel regarding settlement | | | |
| 4/18/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Telephone call with co-counsel | | | |
| 4/19/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Voice mail for opposing counsel | | | |
| 4/20/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Telephone call with opposing counsel | | | |

Matter Time and Expense (with memo)

**Matter ID:** 1178-CONT:
**Matter Name:** Diane Reczek v. Tilton Terrace
**Contract Amount:** $ 0.00
**Printed on:** 6/11/2008

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|---|---|---|---|---|---|
| 4/23/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Call opposing counsel regarding settlement | | | |
| 4/25/2007 | GKF | Communicate | 0.40 | 0.40 | $90.00 |
| | | Telephone call with opposing counsel; E-Mail with co-counsel | | | |
| 4/30/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Call opposing counsel regarding News Journal article; E-Mail copy to co-counsel | | | |
| 5/2/2007 | GKF | Communicate | 0.20 | 0.20 | $45.00 |
| | | Call opposing counsel and co-counsel regarding settlement | | | |
| 5/4/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Call to opposing counsel | | | |
| 5/9/2007 | GKF | Communicate | 0.10 | 0.10 | $22.50 |
| | | Call opposing counsel | | | |
| 5/10/2007 | GKF | Communicate | 0.60 | 0.60 | $135.00 |
| | | Calls with co-counsel and opposing counsel; Draft letter for opposing counsel | | | |
| 5/15/2007 | GKF | Communicate | 0.50 | 0.50 | $112.50 |
| | | Call opposing counsel; Review order for status conference and report | | | |
| 5/16/2007 | GKF | Communicate | 0.80 | 0.80 | $180.00 |
| | | Communicate with co-counsel and opposing counsel | | | |
| 5/17/2007 | GKF | Draft/Revise | 1.70 | 1.70 | $382.50 |
| | | Draft joint status report and e-mail to co-counsel and opposing counsel | | | |
| 5/18/2007 | GKF | Communicate | 0.90 | 0.90 | $202.50 |
| | | Discuss joint status report with opposing counsel; Make revisions and file | | | |
| 5/21/2007 | GKF | Communicate | 0.50 | 0.50 | $112.50 |
| | | Telephone call and e-mail with opposing counsel concerning status conference and settlement | | | |
| 5/23/2007 | GKF | Communicate | 0.60 | 0.60 | $135.00 |
| | | Telephone call with opposing counsel and court regarding status and withdrawal by opposing counsel | | | |
| 6/28/2007 | GKF | REVIEW | 0.50 | 0.50 | $112.50 |
| | | Review court rules regarding default motion, call opposing counsel regarding same | | | |
| 6/28/2007 | JT | Draft/Revise | 0.20 | 0.20 | $25.00 |
| | | Research Federal Rule 55A. | | | |
| 6/29/2007 | JT | Draft/Revise | 0.80 | 0.80 | $100.00 |

Matter Time and Expense (with memo)

**Matter ID:** 1178-CONT:
**Matter Name:** Diane Reczek v. Tilton Terrace
**Contract Amount:** $ 0.00
**Printed on:** 6/11/2008

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|------|--------|-------------|-------|-------------|----------|
| | | Draft Motion for Entry of Default, Order and Certificate of Service; Compile exhibit; Prepare for attorney review. | | | |
| 7/2/2007 | GKF | REVIEW | 0.80 | 0.80 | $180.00 |
| | | Review and revise motion for entry of default | | | |
| 7/2/2007 | JT | PREPARE | 0.30 | 0.30 | $37.50 |
| | | Efile Motion for Default; Prepare copies for service on all parties; Email to co-counsel. | | | |
| 7/3/2007 | GKF | REVIEW | 0.30 | 0.30 | $67.50 |
| | | Review court orders and entry of default; e-mail copies to co-counsel | | | |
| 7/17/2007 | JT | Draft/Revise | 0.50 | 0.50 | $62.50 |
| | | Prepare Default Judgment. | | | |
| 7/23/2007 | GKF | REVIEW | 0.30 | 0.30 | $67.50 |
| | | Review and revise default judgment motion | | | |
| 7/24/2007 | JT | Draft/Revise | 0.10 | 0.10 | $12.50 |
| | | Revise Default Judgment per attorney comments. | | | |
| 7/26/2007 | JT | Draft/Revise | 0.30 | 0.30 | $37.50 |
| | | Revise Motion per attorney comments; E-file; Prepare for service on all parties; E-mail copy to co-counsel | | | |
| 4/3/2008 | GKF | Communicate | 0.80 | 0.80 | $200.00 |
| | | Call with client; E-Mail co-counsel on damages hearing | | | |
| 4/10/2008 | GKF | PREPARE | 1.00 | 1.00 | $250.00 |
| | | Prepare damages calculation for damages hearing; Call co-counsel | | | |
| 4/11/2008 | GKF | COURT HEARING | 2.40 | 2.40 | $600.00 |
| | | Prepare for and attend damages hearing; E-Mail co-counsel regarding same | | | |
| 4/22/2008 | JR | Communicate | 0.10 | 0.10 | $13.50 |
| | | Email DOL copy of Judge's Order for the damages hearing. | | | |
| 4/29/2008 | GKF | Communicate | 2.20 | 2.20 | $550.00 |
| | | Call DOL and review file; E-Mail documents to co-counsel | | | |
| 4/30/2008 | GKF | Communicate | 0.40 | 0.40 | $100.00 |
| | | E-Mails with co-counsel and counsel on debt case against JHA | | | |
| 5/1/2008 | GKF | Communicate | 0.20 | 0.20 | $50.00 |
| | | Call with counsel about debt action status against JHA | | | |
| 6/10/2008 | GKF | Draft/Revise | 3.10 | 3.10 | $775.00 |

Matter Time and Expense (with memo)

**Matter ID:**    **1178-CONT:**
**Matter Name:**    **Diane Reczek v. Tilton Terrace**
**Contract Amount:**    **$ 0.00**
**Printed on:**    **6/11/2008**

| Date | Emp ID | Description | A-Hrs | B-Hrs/Units | Bill Amt |
|------|--------|-------------|-------|-------------|----------|
| | | Draft Memorandum for Court on damages claim; E-Mail to co-counsel | | | |
| 6/10/2008 | JR | Draft/Revise | 0.30 | 0.30 | $40.50 |
| | | Prepare Affidavit for Attorneys Fees. | | | |
| | | **Total Services** | **43.40** | **43.40** | **$9,381.50** |

**Expenses:**

| Date | Emp ID | Description | | B-Hrs/Units | Bill Amt |
|------|--------|-------------|--|-------------|----------|
| 12/11/2006 | Firm | copies | | 2.00 | $0.20 |
| 12/11/2006 | Firm | Postage | | 1.00 | $0.39 |
| 1/30/2007 | Firm | State of Delaware - Entity Details | | 1.00 | $20.00 |
| 4/13/2007 | Firm | PACER | | 1.00 | $0.08 |
| 5/1/2007 | Court Filing | Research Fees | | 1.00 | $6.00 |
| 6/28/2007 | Firm | PACER | | 2.00 | $0.16 |
| 7/2/2007 | Firm | Copies | | 8.00 | $0.80 |
| 7/2/2007 | Firm | Postage | | 2.00 | $0.82 |
| 7/26/2007 | Firm | Copies | | 9.00 | $0.90 |
| 4/30/2008 | Delaware Department of Labor | | | 1.00 | $8.50 |
| | | **Total Expenses** | | **28.00** | **$37.85** |

| Contract Amount | Contract Type | Status | | | |
|-----------------|---------------|--------|--|--|--|
| $ 0.00 | Hourly | NA | | | |

**Grand Total:**    **$9,419.35**

RE:    Diane Reczek v. Tilton Terrace of Delaware, LLC d/b/a Tilton Terrance;
and JHA Wilmington, Inc.

| DATE | SERVICE | HOURS |
|------|---------|-------|
| 09/14/06 | Initial consultation with client; including review of file | 3.25 |
| 10/03/06 | Prepared letter to EEOC requesting Right to Sue | .25 |
| 10/30/06 | Receipt and review of EEOC Right to Sue | .25 |
| 12/07/07 | Meeting with client to discuss case | .50 |
|  | Preparation of Complaint | 2.5 |
|  | Legal research | 1.0 |
| 02/02/07 | Prepared and forwarded correspondence to local counsel | .25 |
| 02/13/07 | Receipt and review of Defendant, JHA Wilmington, Inc. d/b/a Tilton Terrace's Answer to Complaint and Affirmative Defenses | .50 |
| 03/14/07 | Prepared and forwarded correspondence to local counsel enclosing file documents | .25 |
| 05/16/07 | Prepared and forwarded letter to client regarding Status of case | .50 |
| 05/21/07 | Receipt and review of counsel for Defendants' Motion to Withdraw as Counsel | .25 |
|  | Various strategic discussions with Kevin Fasic | 1.5 |
|  | TOTAL: | 11.0 |

11.0 X $325 Per hour        $3,575.00

COSTS:

| | |
|---|---|
| Filing Fee | $350.00 |
| Copies | $3.40 |
| Hand Delivery | $7.50 |
| Subpoenas | $65.00 |
| Total | $425.90 |